**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

MAYA NYE, a citizen of Kanawha
County and other current or former
 residents of, and workers in, Kanawha
County
                Plaintiffs,

        v.                                      Case No. 2:11-cv-0087

BAYER CROPSCIENCE, L.P.,

                Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF TEMPORARY RESTRAINING ORDER**

In support of their Motion for Temporary Restraining Order, Plaintiffs, by Counsel, respectfully state as follows:

**I.    Statement of the Case**

The Complaint in this action was filed on February 8, 2011; at Plaintiffs' request under Rule 4(d), Defendants have waived service.  Plaintiff's Counsel hereby certifies that the Complaint, Summons, Motion for Temporary Restraining Order, Memorandum in Support, and Affidavit of Maya Nye were emailed to Michael Fisher, Esq., Counsel for Defendants on February 8, 2011. An Exhibit Volume has been transmitted by ftp via yousendit.com.  Plaintiffs have also directed copies of the foregoing pleadings to Sheri Roberson, Esq. and George Goodrich, Esq. in the Defendant's General Counsel's office in Research Triangle Park, North Carolina on February 8, 2011, Esq., via email.  Verbal and email notice of this suit and the intent to seek injunctive relief were communicated to Defendant's General Counsel's office, and to Michael Fisher, Esq. of JacksonKelly, PLLC, on the afternoon and evening of Monday, February 7, 2011.

II.      Statement of Facts

Methyl isocyanate (MIC) is the highly toxic chemical which killed between 8,000 and 10,000 citizens of Bhopal, India within 72 hours of the 1984 explosion of Union Carbide's MIC plant, and an estimated 25,000 later from gas-related diseases attributed to the catastrophic Bhopal disaster.  Many thousands more continue to suffer from long-term injuries sustained as a result of the Bhopal disaster. The Union Carbide plant in Bhopal released approximately 88,000 pounds (40 tons) of MIC at the time of the Bhopal disaster; Bayer's pesticide manufacturing facility in Institute, West Virginia stored approximately 200,000 pounds of MIC at the time of the August 2008 explosion.  Although Bayer in August 2009 announced an 80% reduction of the MIC volumes to be stored at Institute, Bayer's Risk Management Plan (EXHIBIT "H-2") records volumes planned to remain on site will equal 50,000 pounds, nearly 60% of the volumes released at Bhopal.

Importantly, Bayer's January 11, 2011 announcement that it had reconfigured the production process at Institute to eliminate above-ground storage, indicated that substantial volumes of MIC would continue to be stored underground at Institute.   Critically, Bayer's January 2011 announcement indicated that it had **not** adopted the practice, initiated by Dupont after the Bhopal disaster, of only producing MIC in volumes immediately consumed by other chemical processes, thereby eliminating the risks associated with ongoing, on-site storage of the highly toxic MIC.  The Dupont strategy of eliminating on-site storage was rejected because of the cost of reconfiguring the Institute facility.

Assessing Bayer's continued manufacture and storage at Institute of substantial volumes of MIC does not begin with a clean slate.  As stated in the Complaint[1] filed in this action, on August 28, 2008, an explosion at Bayer's MIC production plant at Institute, WV involved virtually all of the factors of the

---

[1] Plaintiffs incorporate by reference the facts appearing at ¶¶  1 to 27 of the Complaint.

Bhopal disaster except the loss of life in massive numbers.  For Plaintiffs, the differences in the body count offer little comfort.  Indeed, the awareness that a massive loss of life was avoided on by the arbitrary flight path of Bayer's "residue treater" and the random distribution pattern for the shrapnel released on  August 28, 2008 explosion -- in plain language, simple luck -- makes continued manufacture and storage of MIC at Bayer's Institute site a constant, immediate fear to residents of Institute and the surrounding Kanawha County community, and seriously impairs their enjoyment of their property.

That the outcomes were a merely fortuity and **not** a result of any planned precautions or special safety practices adopted by Bayer is confirmed by the long litany of Bayer's incompetent management of the chemical facility at Institute since its 2002 acquisition of the plant.  That litany, all too familiar to the residents of Institute and adjoining communities, includes the following:

- 2010

  February 22, 2010:

  A "small amount" of acetic acid was released at the Bayer plant while workers were trying to clear lines of a barge docked at the Institute facility.  Residents began calling Metro 911 about 1 pm to report a sulfur smell; some complained of headaches.  A Bayer employee called Metro 911 at 2 pm to report the leak. The employee said there was no danger to the public.

  Acetic acid, also known as ethanoic acid, is an organic acid that gives vinegar its sour taste and pungent smell. It is used as a solvent, among other things. Concentrated acetic acid is corrosive and can burn the skin and eyes.

(The Charleston Daily Mail, 2/23/10; The Charleston Gazette 2/23/10)

  February 4 through February 17, 2010:

  More than 3,500 pounds of ammonia gas from the Bayer-operated, Dow Chemical Co. facility in Institute went undetected for nearly two weeks.  The leak occurred in Dow's ethylene oxide catalyst unit, which is located on Bayer CropScience property at the multi-company Institute site. Metro 911 said the leak was reported at 1:52 p.m. Wednesday, February 17.[th] An all-clear was given at 3:40 p.m. that same day. Metro 911 Shift Capt. Joe Coen reported that the plant found ammonia had been leaking through a relief valve at the top of the anhydrous ammonia tank at a rate of nearly 270 pounds per day from Feb. 4 to 17, totaling more than 3500 pounds.

3

Coen said plant officials didn't discover the leak until they saw the gauges dropping and checked the changes against their records. (Question: Why did monitors not pick up the leak?) "Operators had been looking at their inventory records and saw that the gauges had been dropping for days," he told The Charleston Gazette.

Ammonia is a colorless gas with a pungent, suffocating odor.  It is caustic and is a powerful irritant.  It can burn the skin and other parts of the body.  Depending on the amount, exposure can also cause severe pulmonary and gastrointestinal irritation, nausea, vomiting, pulmonary edema and even death.

(The Charleston Gazette 2/18/10)

• 2009:

October 24, 2009:

Twelve pounds of hydrogen cyanide leaked at the Bayer facility in Institute on Saturday, October 24. Plant spokesman Tom Dover said the leak from a distillation column was fixed by maintenance workers.

Hydrogen cyanide is a poisonous gas that can cause irritation to eyes, skin and respiratory tract, as well as nausea, headache and dizziness. Symptoms of exposure may be delayed.  OSHA says high concentrations of it can rapidly cause death.

(The Charleston Gazette 11/2/09)

February 15, 2009:

About five gallons of liquid cesium sulfate were spilled. The chemical is used as a promoter in a catalyst production process at the plant, Bayer officials said, stating that it is a non-toxic liquid and presented no danger to the public. Workers were moving a pallet of large plastic totes in which the chemical is stored when one of the pallet's edges got caught on a tote's valve and cracked it.

(The Charleston Gazette 2/25/09)

• 2008:

September 2008:

4

Bayer agrees to pay $112,500 in EPA settlement to resolve wide-ranging violations at its Institute plant (committed by a prior owner but not rresolved until 2008), including:

---between January 1999 and March 2001, the plant disclosed three dozen water pollution violations in its required monthly discharge reports to regulators. These included repeated instances where the plant discharged far more than its allowed limits of toluene, cyanide, and solids into the Kanawha River;

---among the violations were numerous instances where the plant dumped more than a dozen times its legal limit of chloroform. EPA inspectors also allege that the plant officials did not properly monitor water pollution discharges or update a water pollution control plan;

---EPA inspectors discovered that the plant was not monitoring the flow of materials out of three vents meant to discharge air emissions during startup, shutdown and malfunctions in the Carbaryl insecticide unit. Plant officials did not report how much pollution was emitted from these vents during seven incidents in 2000 and 2001;

---Plant officials underreported routine toxic emissions of a total of more than 1,000 of four chemicals in its Toxics Release Inventory filings for 1999, EPA found. The plant also did not properly report a total of 46,000 pounds of 15 different chemicals. The chemicals were dumped at an off-site landfill, as opposed to an on-site facility, as the plant had reported in its TRI filings;

---On February 5, 2001, plant officials waited almost 5 hours to report a leak of the pesticide carbosulan. The leak occurred at 10:30 pm, and the plant did not report it to federal authorities until 3:19 am the following morning. Federal law requires such leaks to be reported immediately. Plant officials also violated federal law by not filing a required follow-up report with more details of the incident.

(The Charleston Gazette 9/12/08)


Late September 2008:

A reported leak of MIC that was dismissed by a Bayer spokesman as a "non-incident." Tom Dover, Bayer spokesperson, confirmed that a tank associated with the MIC storage was opened during inspections in the west side of the plant, but stated that the amount of chemical leaked was far below reportable levels. Workers took action after smelling the odor of MIC, which Dover said has a strong smell even at low levels. Employees then left the area and several were checked out at the plant's medical facility. One contractor then decided on his own to go to an outside hospital after his shift.

Dale Petry, Kanawha County Emergency Services Director, stated that he was disturbed that he didn't know about the situation. "I wish I had known about it," said Petry. "Let me make the decision whether it should be reported to the public." County officials said they first heard about the MIC release when WSAZ contacted them about it.

(The Charleston Gazette 11/18/08; www.wsaz.com/mobi?storyid=33401989)

- 2007

<u>December 28, 2007:</u>

Leak of thiodicarb, a chemical used in insecticides, causing a cabbage-like odor that could be smelled up and down the Kanawha Valley and into neighboring Putnam. Company officials said not enough of the chemical escaped to pose a health threat, but Kanawha County Commission President Kent Carper blasted the company for failing to notify emergency service officials or the public about the nature of the release for several hours. "The notification was just absolutely abysmal from Bayer," Carper said after the Dec. 28 incident.  "Information given to the first responders was so inadequate that no one knew totally what to do."

Complaints about odors near the plant continued to come in to Metro 911, emergency officials said and complaints continued about lingering odors in the Nitro and St. Alban's area near the plant on Dec. 29 and 31st.  There were additional complaints about odors and the strange haze near the plant on Jan. 1st.

"If there are leaks, they're supposed to tell us," Carper said. "Everybody's denying there are any leaks, but we keep getting these reports."  Carper further told press upon hearing of the thiodicarb release: "How could it be a controlled event when the chemical release (could be smelled) clear down in Putnam County?"

Hundreds of people complained about the strong odors coming from the Institute plant for nearly one week before Bayer attributed the smell to a "minor release" of thiodicarb. At least one person was hospitalized.

Bayer agreed earlier in week that a plant worker had noted a blue haze over plant but they could not explain. The World Health Organization describes the substance as extremely toxic and potentially carcinogenic. It has been banned in the European Union.

(WVDEP cited them for air pollution violation) (The Charleston Gazette, Jan. 9, 2008)

<u>December 20, 2007:</u>

Residents in St. Albans, across the river from plant, reported odors from a faulty tank at the facility's wastewater treatment plant; (WVDEP cited for air pollution violation) (The Charleston Gazette, Jan. 9, 2008)

<u>November 16, 2007:</u>

A spill of about 100 pounds of Rhodimet, a chemical used in animal feed, caused bad odors that lasted for 10 days. (WVDEP cited them for air pollution violation.)

(The Charleston Gazette, Jan. 9, 2008)

The fear Plaintiffs experience currently is not confined to the period of Bayer ownership, but is cumulative and includes the following:

August 13, 2001:

10 workers received medical treatment after a chloroform leak at the plant. (The Charleston Gazette 8/30/08)

October 15, 1999:

A shelter-in-place advisory is issued for residents within two miles of plant after a leak of the deadly gas phosgene. (The Charleston Gazette 8/30/08)

July 28, 1997:

High winds and heavy rains shut down a chemical disposal system and blow out an incinerator flame, prompting the release of a relatively small amount of MIC. (The Charleston Gazette 8/30/08)

February 15, 1996:

A leak and fire involving the chemical toluene prompted another widespread shelter-in-place advisory across the western part of the valley. Rhone-Poulenc pays $450,000 fine to OSHA. (The Charleston Gazette 8/30/08)

December 13, 1994:

A faulty chemical pump caused a leak of sulfur dichloride; one worker injured, others forced to shelter in place. (The Charleston Gazette 8/30/08)

March 1994:

Union Carbide fined $75,000 for not reporting a leak of ethylene oxide. (www.endgame.org/carbide-history.html)

June 19, 1994:

A high-tech monitoring system somehow allows a large leak of untreated wastewater from the plant to be discharged into the Kanawha River. (The Charleston Gazette 8/30/08)

August 18, 1994:

Thousands of Kanawha Valley residents take shelter in their homes after an explosion rips through the Institute facility. One worker is killed in the blast, and a second dies 10 years later from the effects of cyanide that burned his lungs. OSHA fines the company $1.7 million, but later settles for $700,000. (The Charleston Gazette 8/30/08; The Charleston Gazette Dec. 2, 2004)

May 20, 1993:

More than 1,000 residents of Institute and West Dunbar shelter in their homes because of a chlorine leak from the Institute plant's barge loading dock. (The Charleston Gazette 8/30/08)

August 13, 1988:

Fire and explosion of 4300 pounds of ethylene oxide at Institute; tetranaphalene was spilled in the river killing 3000 fish. (www.endgame.org/carbide-history.html)

June 1986:

Explosion injures employee at plant. (www.endgame.org/carbide-history.html)

April 1986:

After 1985 inspection of five of 18 units at Institute plant, OSHA alleged 221 violations of health and safety laws and proposed $1.4 million in fines. OSHA classified 72 of the 221 violations as "serious," where there is substantial probability of death or substantial physical harm. (www.endgame.org/carbide-history.html)

August 11, 1985:

At least 135 people sought treatment at area hospitals after a leak of aldicarb oxime and four other chemicals from the plant, then owned by Union Carbide. There was a 20-minute delay between the time the leak was first detected and the alert was sounded. An initial fine of $32,000 was dropped to $4,400 when the company agreed to buy an accident simulator for worker training exercises. (The Charleston Gazette 8/17/85)

February 1985:

8

Union Carbide notified the EPA that since 1980, 190 chemical leaks had occurred at its Institute plant, including 61 MIC leaks, 107 leaks of phosgene and 22 leaks of both. (www.endgame.org/carbide-history.html)

January 23, 1985:

The US EPA announced that Union Carbide records showed that there had been 28 leaks of MIC at the Institute plant in the years 1980 through 1984. (www.endgame.org/carbide-history.html)

Plainly, the fear currently experienced by Plaintiffs and other citizens of Institute, WV and surrounding communities, is fact-based and reasonable.

III.     Controlling Case Law of Temporary Restraining Orders

The long-standing, controlling test for issuance of a temporary restraining order is stated in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193-96 (4th Cir. 1977). The decision in *Blackwelder* sets forth a "balance-of- hardships" test to determine whether interim extraordinary relief is appropriate. See *Blackwelder*, 550 F.2d at 194. The test requires consideration of the following four factors:

> (1) the likelihood of irreparable harm to the movant if the requested interim relief is denied;
>
> (2) the likelihood of harm to the non-movant if the relief is granted;
>
> (3) the movant's likelihood of success on the merits; and
>
> (4) the public interest.

See *Hughes Network Sys., Inc. v. InterDigital Comm'n Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *Blackwelder*, 550 F.2d at 193-96.

The overriding concern to balance opposing hardships was underscored in *Rum Creek Coal Sales,*

9

*Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991):

> The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors. If, after balancing those two factors, the balance 'tips decidedly' in favor of the plaintiff, . . . [interim relief] will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.'

*Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir. 1991).

Clearly, the movant must make a clear showing of irreparable harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 360 (4th Cir.1991)), and the threatened irreparable harm must also be "actual and imminent," not remote or speculative. Id. (internal quotation omitted).

For purposes of the present discussion, the focus for TRO purposes of competing injury, mirrors in large part the competing interests assessed in determining the existence of a nuisance, discussed below, effectively merging the discussion of likelihood of success on the merits with the balancing of injuries.

IV.      Argument

The facts in support of this request for a Temporary Restraining Order in this case could not be more compelling, nor the balance of interests -- public and private -- so clearly and unambiguously resolved in favor of issuance of an order of temporary relief.  The balancing test in this case ultimately requires that this Court acknowledge: (a) the current, palpable reason-based fear, experienced by Plaintiffs and other members of the affected communities, which greatly impairs their property rights, plus (b) the imminent risk of a catastrophic industrial disaster, potentially causing permanent bodily injury and/or loss of life to thousands.

Compounding this analysis is the unique stress associated with living through yet another effort on Bayer's part to restart its MIC production plant.  The  start up of Bayer's "new and improved" MIC

production announced on January 1, 2011 takes place against the backdrop of Bayer's Chief Executive Officer's public acknowledgement that Bayer has repeatedly employed deception and dissembling in its communications with government officials and the public.

Specifically, Bayer's CEO admitted in 2009 that it had invoked the provisions of homeland security legislation, which barred release of certain information, to enhance its public relations posture and to avoid a serious discussion of the inherent dangers of manufacturing MIC in a major population center.   The abuse of homeland security exemptions from disclosure was so repugnant that the Congress immediately passed amendments to controlling legislation to eliminate the already thin reed behind which Bayer was attempting to hide.  Thus, Congress passed the American Community Right to Know Act, which amended the relevant statute to add the following italicized language:

> (d) Nondisclosure of Information.—
>
> (1) In general.— Information developed under this section or sections 70102, 70104, and 70108 is not required to be disclosed to the public, including—
> (A) facility security plans, vessel security plans, and port vulnerability assessments; and
> (B) other information related to security plans, procedures, or programs for vessels or facilities authorized under this section or sections 70102, 70104, and 70108.
>
> *(2)  Limitations.— Nothing in paragraph (1) shall be construed to authorize the designation of information as sensitive security information (as defined in section 1520.5 of title 49, Code of Federal Regulations)—*
> *(A) to conceal a violation of law, inefficiency, or administrative error;*
> *(B) to prevent embarrassment to a person, organization, or agency;*
> *(C) to restrain competition; or*
> *(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.*

46 U.S.C. § 70103 (emphasis added).

The result of Bayer's history of recklessness, towards both safety and the truth, is that routine assurances that all is well and nothing bad will happen, which Bayer's public relations department disseminate daily, must be discounted by any informed person.  To be more direct, no reasonably informed persons, not Plaintiffs and not this Court, should swallow -- hook, line and sinker -- the

11

assurances of safety from Bayer's PR machine, on this record, where the stakes are so high, and Bayer's safety record is so sorry, and their credibility so thin.

<u>West Virginia's common law of nuisance</u>

In West Virginia, nuisance "is a flexible area of the law that is adaptable to a wide variety of factual situations." *Sharon Steel Corp. v. City of Fairmont*, 175 W. Va. 479, 483-84 (1985). The Supreme Court of Appeals of West Virginia has generally described a nuisance as:

> Anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable….A nuisance is anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort….A condition is a nuisance when it clearly appears that enjoyment of property is materially lessened, and physical comfort of person in their homes is materially interfered with thereby.

*Duff v. Morgantown Energy Associates*, 187 W. Va. 712, 715 (1992) (quoting *Hendricks v. Stalnaker*, 181 W. Va. 31, 33 (1989)).

Within this broad definition, a private nuisance is defined as "a substantial and unreasonable interference with the private use and enjoyment of another's land," (<u>Hendricks</u> at syllabus point 1) and further described as "conduct that is intentional and unreasonable, negligent or reckless, <u>or that results in…abnormally dangerous conditions or activities in an inappropriate place.</u>" (<u>Hendricks</u> 33-34) (emphasis added). The Court has adopted a balancing test to determine whether a given interference is "unreasonable," weighing whether the gravity of the harm to the individual is greater than the social value of the activity alleged to cause the harm. (<u>Hendricks</u> at syllabus point 2).

A public nuisance, rather than harming a limited number of persons, affects an indefinite number of persons, i.e., the general public. <u>Hark v. Mountain Fork Lumber Co.</u>, 127 W. Va. 586, 595-96 (1945). While public officials are routinely regarded as having standing to bring a suit to abate a public nuisance, a private plaintiff able to show an injury "different in both kind and degree" from the public may also bring a case as a public nuisance. <u>Duff</u>, 187 W. Va. at 716 n.7.

Nuisance suits frequently involve conduct or land use that is presently occurring, such as when a plant emits coal smoke and soot, Parker v. City of Fairmont, 72 W. Va. 688 (1913), thus providing greater evidence bearing on the harm and value of the activity in question.  But courts also have authority to enjoin a facility or company from future conduct, termed a prospective (or anticipatory) nuisance. William L. Prosser & W. Page Keeton, Prosser and Keeton on the Law of Torts § 89, at 640-41 (5th ed. 1984).

Where the nuisance in question is a nuisance per se, or a nuisance regardless of context or circumstance,[2] most jurisdictions will permit an injunction.  Other activities are called a nuisance per accidens, or an action that becomes a nuisance through facts, surroundings, or other circumstance. Duff, 187 W. Va. at 717 (quoting Chambers v. Cramer, 49 W. Va. 395, syllabus point 2 (1901)).  The Supreme Court has written that such a nuisance "may be merely a right thing in a wrong place, like a pig in the parlor instead of the barnyard."  Village of Euclid, Ohio, et al. v. Amber Realty Co., 272 U.S. 365, 388 (1926).

Present Nuisance Rooted in a Reasonable Fear

Bayer's MIC production plant in Institute is a currently experienced, present nuisance based on the "substantial and unreasonable interference with the private use and enjoyment of another's land" caused by the reason-based fear of catastrophe in light of Bayer history of mismanagement and misconduct.  Cases recognizing present nuisance based on reason-based fear date to the late 19th and early 20th centuries, during the upheaval caused by the American Industrial Revolution and concomitant advances in technology.  Courts applying this theory considered the storage of nitroglycerin, the building

---

[2] In some jurisdictions this is only possible where the activity is illegal, such as the establishment of a brothel.  See, e.g., City of Bowie v. Board of County Comm'rs, 260 Md. 116, 127-28 (1970).

of facilities to care for terminally ill patients, the housing of a leper, and the planned construction of a reservoir on a hillside just above a residential area. *Doane* at 460-61.

In *Ferry v. City of Seattle*, 200 P. 336 (1921) ("Ferry I"), the Supreme Court of Washington first declined to issue an injunction due to the failure of plaintiffs to show a high probability of injury if the reservoir were constructed, and presuming that it would be constructed safely. Ferry I, 200 P. at 340. Four months later, however, the court reversed itself and issued an injunction based on the interference with the plaintiffs' enjoyment of their property caused by their fears for their lives. *Ferry v. City of Seattle*, 203 P. 40 (1922) ("Ferry II"). The court explicitly considered "the realization of the injury which would certainly ensue" should the reservoir break as the basis for the reasonableness of the plaintiffs' fear, rather than the level of probability that it would in fact break. Ferry II, 203 P. at 40. To wit:

> If the breaking of the proposed reservoir would probably result in comparatively small damage and no loss of life, I would not demand proof of its safety with a high degree of certainty; but, in view of what now seems to me would be the appalling result of such breaking, I would want the necessity of its location there, and its safety, to be proven beyond all doubt, before withholding the injunctive relief prayed for.

Id. at 42 (Parker, C.J., concurring).

Cases upholding a finding of present nuisance from reason-based fear typically involved the plaintiffs complaining of interference with the enjoyment of their residential property – their homes – and sought to enjoin the intrusion of dangerous activities into their enjoyment and use of that property. *Doane* at 462. Maya Nye's affidavit in this proceeding makes it plain that Plaintiffs and other residents in Institute and surrounding communities experience rationally based fears that significantly impair their day-to-day enjoyment of life at their residences, i.e., which unreasonably interfere with enjoyment of their property rights.

14

There is nothing speculative, prospective or futuristic about the fear which Plaintiffs and others in Institute and surrounding communities experience daily. They have lived through multiple episodes of varying degrees of seriousness. They know that it is merely a matter of time before another leak occurs, and have no assurance that it will be trivial (as Bayer repeatedly assures), another catastrophe on the order of the August 28, 2008 explosion, or one where the flight path of air-borne metal hits targets with much more toxic results than that experienced on August 28, 2008. Indeed, no one can assure Plaintiffs or the community of the releases to be expected from an accident like that on August 28, 2008 because -- after all -- Bayer turned off the air monitoring equipment.

<u>Prospective injury</u>

Where the action or conduct complained of is not yet a nuisance per se and the injury complained of has not yet occurred, a presumption exists that "a person entering into a legitimate business will conduct it in a proper way, so that it will not constitute a nuisance." <u>Chambers</u>, 495 W. Va. 395 at syllabus point 2.

Plainly, any presumption that might ordinarily apply where the parties are starting out with a clean slate, has no weight in the circumstances of this case. Bayer's long history of incompetence and recklessness has been laid out in detail in real time, for all to see, hear and smell. That history fully supports Plaintiffs' position that future leaks from Bayer's MIC plant ate not speculative, but are in fact "reasonably certain", and the MIC plant therefore constitutes a nuisance.

Bayer's history shows "beyond all ground of fair questioning" that a prospective leak will occur and that a nuisance exists. Courts have not hesitated to enjoin an activity prospectively "if it is 'reasonably certain' that such activity will constitute a nuisance." <u>Duff</u>, 187 W. Va. at 717 (<u>citing</u> <u>Chambers</u>, 495 W. Va. 395 at syllabus point 3). To enjoin a prospective nuisance, the court must find

15

that the danger is "impending and imminent…[as] established by conclusive evidence," the damages must be serious, and the "balancing of the equities" must favor granting the injunction, i.e., that more harm must be inflicted by refusing the injunction, than by granting it. Id. (citing Chambers).

In sum, although enjoining a prospective nuisance requires a showing the injury is "reasonably certain" to occur, the history of Bayer's operation of the Institute plant makes it clear that the only purely speculative, fantasy-based projection is that the Institute plant will **NOT** experience leaks, serious leaks, in the future. Given this history, the court must conduct a balancing of the equities between the parties and assess the gravity of the harm that may occur without an injunction, relative to the social value of the conduct alleged to cause that harm. West Virginia's jurisprudence in this regard represents a significant improvement over the approach utilized in those jurisdictions across the country, in which the magnitude of the injury feared is not considered. See generally Charles J. Doane, Comment:  Beyond Fear:  Articulating a Modern Doctrine in Anticipatory Nuisance for Enjoining Improbable Threats of Catastrophic Harm, 17 B.C. Envtl. Aff. L. Rev. 441 (1990); Andrew H. Sharp, Comment:  An Ounce of Prevention:  Rehabilitating the Anticipatory Nuisance Doctrine, 15 B.C. Envtl. Aff. L. Rev. 627 (1988).

In Duff, a West Virginia prospective nuisance case in which the Supreme Court of Appeals overturned a circuit court decision granting an injunction of a power company's plans for a trucking route on nuisance grounds, the Court cited not to a previous West Virginia case to provide precedent for actually finding a prospective nuisance and granting an injunction against it, but to a case from Illinois (albeit a foundational case in the field).  187 W. Va. at 717 n.10.

In Duff, the trial court granted an injunction against a particular trucking route for coal planned by the appellant energy company on both private and public prospective nuisance grounds.  187 W. Va. at 714-15. The Court considered the degree of certainty of the occurrence of the harm, the nature and

gravity of the harm, and the balance of the harm relative to the social value of the trucking.[3]  Id. at 719.

After reviewing the evidence, the Supreme Court of Appeals found that trucking was not a nuisance per

se, and that from the available record, "it does not clearly appear…that the proposed trucking either

threatens devastating harm or is certain to result in serious damages or irreparable injury." Id.  Though

stressing that plaintiffs would later have an opportunity to show that the trucking was a nuisance in fact

once operational, the court declined to find a prospective private nuisance.

    Duff relied on Hendricks, a case decided just three years earlier, for many of its statements of

law.  One landowner planned to place a septic tank on the only parcel of his new property flat enough to

accommodate one, but the adjoining neighbor drilled for a water well on his property in a place near

enough to the targeted location to make obtaining a permit for the septic tank impossible.  Hendricks,

181 W. Va. at 32-33. The unreasonableness of the interference was determined by balancing the gravity

of the harm against the social value of the activity.  Id. at 35.  The court noted that the interference with

the landowner's property caused by the neighbor's conduct surely was substantial – it made operating a

septic tank on the property impossible. The critical question was whether the interference was

unreasonable, and on that point, the court held for the neighbor, finding that absent evidence of

malicious intent, the competing interests were roughly equal, and therefore no private nuisance was

present.  Id. at 35-36.

    No comparable equation exists in this case.  Plaintiffs current reason-based fears, and

prospective damage to, Plaintiffs far exceed the incremental economic injury to the Defendant from its

termination of MIC operations in February 2011, instead of the already planned termination of such

activities in mid-2012.

---

[3] The West Virginia Supreme Court of Appeals has previously recognized circumstances where coal hauling could amount to an unreasonable use of public roadways, thus constituting a public nuisance.  Duff, 187 W. Va. at 719 n.19 (citing West v. National Mines Corp., 168 W. Va. 578 (1981), reh'g on appeal, 175 W. Va. 543 (1985)).

Sharon Steel examined the law of nuisance from a slightly different posture. The city of Fairmont, West Virginia, passed an ordinance making it unlawful for "any person to permanently dispose or attempt to permanently dispose of hazardous waste within the City," while allowing for "storage" of such waste where such storage was defined as temporary.  175 W. Va. at 482.  Sharon Steel had sought to construct a permanent hazardous waste storage facility at a location where it had operating a coking plant for three decades, which had produced significant amounts of hazardous waste as a byproduct.  Id. at 481.  The definition of "hazardous waste" paralleled its definition in federal and state law in relevant respects.  Id. at 482.

The court held that Fairmont was attempting not to regulate the management and control over hazardous waste disposal, but to abate a public nuisance.  Id. at 483.  Such an ordinance was held not to be preempted by either RCRA or the West Virginia Hazardous Waste Management Act, W.Va. Code § 22-18-3 to § 22-18-95, because each have provisions preserving common law actions, including nuisance actions.  Id. at 487.  Furthermore, Fairmont and other municipalities have the authority "to provide for the elimination of hazards to public health and safety" as a public nuisance, W. Va. Code § 8-12-5(23), so long as it can meet its burden to show the allegedly harmful future conduct is a public nuisance.  The court ended up supporting the City's argument on the following grounds:

> [W]hether some activity or thing is a nuisance is generally a question of fact….Therefore, we conclude that while the ordinance declares the permanent disposal of hazardous wastes, as therein defined, within the City of Fairmont to be a public nuisance, the issue of whether a given site is a public nuisance is a question of fact dependent upon the circumstances existing at such site.  We, however, affirm the power of the City to enact such an ordinance as we believe by its terms, under the definition of "hazardous waste," a common law nuisance is defined.

Id. at 488 (citations omitted).

18

Nuisance Per Se

A nuisance per se, is generally defined as "an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings." Duff, 187 W. Va. at 717 (citing Harless v. Workman, 145 W. Va. 266, 274 (1960)). For a prospective nuisance, the plaintiffs must show that the injury to be caused by the nuisance is "impending and imminent and the effect certain … established by conclusive evidence." Id. (quoting Chambers).

Because the Bayer plant is in fact the only plant in the United States continuing to store large quantities of MIC onsite (rather than utilizing the methods pioneered by competitors after Bhopal to create just enough MIC for use at the relevant point of the manufacturing process, followed by immediate consumption of this chemical), the current Bayer process is a nuisance per se, threatening devastating harm in all circumstances, regardless of the warning systems and safety measures implemented.

Courts have considered whether the threatened harm is irreparable when deciding whether conduct is a nuisance per se. The Maryland Court of Appeals considered two requests, far apart in time, for an injunction based on the targeted activity constituting a nuisance per se. While it denied both, the court explicitly considered the prospects of an irreparable injury in doing so. King v. Hamill, 54 A. 625, 627 (Md. 1901); Leatherbury v. Gaylord Fuel Corp., 347 A.2d 826 (Md. 1975) (see also Sharp at 638).

Moreover, the sheer randomness of the previous explosion and the long history of accidents at the plant, demonstrate that imminence is impossible to determine under the best of circumstances; indeed rejection of an injunction on grounds of imminence would mean that an injunction of the Bayer facility must await yet another, even more devastating catastrophe than those already experience (and assumes anyone will be left to file suit). That cannot be the law of this jurisdiction.

19

<u>Village of Wilsonville-Carroll Towing</u>

The <u>Duff</u> Court recognized <u>Village of Wilsonville et al. v. SCA Services, Inc.</u>, 426 N.E.2d 824 (Ill. 1981) as a good example of a case where prospective nuisance theories were applied to enjoin activity threatening catastrophic harm.  Justice Ryan's concurrence in that case is an oft-cited example of how prospective nuisance doctrine could and should change to account for the magnitude of the threatened harm, which the majority approach does not do in most situations.

In <u>Village of Wilsonville</u>, the plaintiffs sought an injunction on public nuisance grounds against a company operating a hazardous waste landfill adjoining their village and located over an abandoned mine site.  The plaintiffs contended that there was a risk of the mine causing the soil holding the waste to break open and contaminate surrounding soil and groundwater, and that the various chemicals stored on the site were incompatible, thus raising a risk of incendiary combination and the release of toxic vapors in the area.  426 N.E.2d at 826-30.  Although the landfill was duly licensed by the Illinois Environmental Protection Agency and had duly obtained new permits each time new waste was delivered to the landfill, the trial, appellate, and Supreme Courts all found a nuisance existed, although under different theories.  Doane at 465-66.  The majority decision for the Supreme Court of Illinois upheld the traditional anticipatory nuisance rule requiring a "high probability" of harm, and then found it highly probable that contamination would occur at the landfill, creating a public nuisance, and thus upheld the grant of an injunction.  <u>Village of Wilsonville</u>, 426 N.E.2d at 836-37.

While Justice Ryan agreed with the majority, he preferred the approach taken by the court below, which had abrogated the "high probability" requirement.  Doane at 467-68. Justice Ryan posited that, in keeping with the position of the Restatement of Torts on preventative injunctive relief generally, that the more serious the anticipated injury, "the less justification there is for taking the chances that are involved in pronouncing the harm too remote."  <u>Village of Wilsonville</u>, 426 N.E.2d at 842(Ryan, J.,

concurring) (quoting Restatement of Torts (2nd) § 933 at 561, comment b (1979)).  Therefore, a balancing test, where a greater severity of threatened harm requires a proportionately lesser showing of the probability of it coming to pass and vice versa, is more appropriate than the "unnecessarily narrow" test used by the majority.  Id.  This permits the court to assess risk rationally, and to:

> …avoi[d] the anomalous result possible under a more restrictive alternative where a person engaged in an ultrahazardous activity with potentially catastrophic results would be allowed to continue until he has driven an entire community to the brink of certain disaster.  A court of equity need not wait so long to provide relief.

Id.

This approach mirrors the famous test constructed by Justice Hand in United States v. Carroll Towing Co. for determining reasonableness in negligence cases, where liability is found if the seriousness of the potential harm, multiplied by its probability of occurring, exceeds the cost of precaution.  Doane at 469 (citing Carroll Towing, 159 F.2d 169 (2nd Cir. 1947).  The favorable citation by the Duff court, its inherent rationality, and its applicability to environmental cases indicate that articulating and pressing this theory may lead to a wider change in the use of anticipatory nuisance in West Virginia cases on environmental harm, and perhaps elsewhere.

Public Nuisance

The burden of proof required to show that MIC procedures is a public nuisance is much the same as that required for a private nuisance; plaintiffs bear the burden of proving that serious harm is reasonably certain to result from Bayer's conduct.  Duff, 187 W. Va. at 721.  The evidence would also need to include those harms that affect the citizenry of Institute as a whole or interfere with public property, rather than private property, unless a plaintiff or plaintiffs were anticipated to suffer a harm different in degree and kind from that of the general public.  Id. at 716, 719-22.

As noted above, a public nuisance in West Virginia is one that affects an indefinite number of persons, and ordinarily only public officials may bring an action to enjoy such a nuisance. <u>Hark</u>, 127 W. Va. at 595-96.  There are exceptions, however.  In <u>West v. National Mines Corp.</u>,168 W. Va. 578 (1981), a landowner adjacent to a public road sought an injunction against a coal company using that road to haul coal.  The resulting dust drove the landowner to clean his house thoroughly, boil his drinking water, give up the tending of his garden, and wear a surgical mask around the house.  <u>West</u>, 168 W. Va. at 579-82.

The court held that the public's right to use of a public roadway "must be exercised in a reasonable manner and with due regard for the right of adjoining property owners to the use and enjoyment of their property.  <u>Id</u>. at 587.  Although the use of the roads by National Mines was technically, it was not reasonable and so that use could be enjoined:  "The law does not allow anyone, whatever his circumstances or conditions may be, to be driven from his house or compelled to live in it in positive discomfort, although caused by a lawful and useful business carried on in his vicinity. <u>Id</u>. (<u>citing</u> <u>Martin v. Williams</u>, 141 W. Va. 595, 610 (1956)).  The court reversed the dismissal of the suit and remanded for the entry of an order consistent with its opinion. <u>Id</u>. at 592.

Plainly, the impact on the Plaintiffs in their homes and offices near, if not immediately adjacent to, the MIC facility are different in kind from that experienced by the community at large, and support a finding of public nuisance.

<u>Conclusion</u>

Opposing the compelling human stakes on the Plaintiffs' side of the equation, is the transitory economic benefit, to a multi-billion dollar, multi-national corporation, from operating an undistinguished pesticide manufacturing plant -- not critical to any significant public purpose -- for the very brief period of another 18 months.

Another 18 months of operation of Bayer's accident prone, and recklessly operated, pesticide facility in Institute, WV, do not outweigh Plaintiffs' real, current fears or the imminent risk to a population center of 300,000 people in the 25-mile radius of Institute (which Bayer itself defines as the "vulnerability zone" in a worst case scenario).  Even if one confines the analysis strictly to economic losses, the potential loss to plaintiffs in the form of diminished property values would, cumulatively, dwarf the profits Bayer can expect to make in the next 18 months.   Moreover, the long-term impact of the Kanawha Valley economy as a whole from a catastrophic release of toxic chemicals would be devastating, converting this state to an economic desert with all the growth potential of "Love Canal."

Plaintiffs' position rests upon the demonstrated irrationality, recklessness, and dangerousness of producing and storing MIC, on-site at Institute.  The alternative position would require this Court to ignore Bayer's safety history and allow Bayer to go forward based upon Bayer's assurances of safety. That is an unreasonable risk to impose on any citizen of the Kanawha Valley.

Plaintiffs respectfully request that this Court enter an order enjoining the resumption or continuation of MIC production by Bayer at the Institute facility until such time as all CSB recommendations have been implemented, and the Congressionally mandated NAS study of the inherent risks of MIC production and storage in a major population center, is available for review.

Respectfully submitted,

/s/William V. DePaulo
William V. DePaulo, Esq.  #995
179 Summers Street, Suite 232
Charleston, WV 25301
Tel: 304-342-5588
Fax: 304-342-5588
william.depaulo@gmail.com

Counsel for Plaintiffs

23