**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

MAYA NYE,  et al.,

        Plaintiffs,

      v.                           Case No. 11-cv-00087
                                  (Hon. Joseph R. Goodwin)

BAYER CROPSCIENCE, L.P.,

        Defendant.


**<u>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION</u>**


For their Reply to Bayer's Opposition to the Motion for Preliminary Injunction, Plaintiffs, by Counsel, respectfully state as follows:

**I.    PRELIMINARY STATEMENT**

Without once acknowledging their long history of regulatory violations, or their CEO's 2009 admission of the company's broad campaign to mislead the Congress and the public on the inherent dangers of MIC, Bayer CropScience, L.P. (Bayer) repeats in its opposition to a preliminary injunction the arguments asserted in opposition to the TRO, i.e., that a DEP permit forecloses this common law nuisance action and that the public interest is best served by continuing the production of TEMIK, which EPA has ordered off the market because of unacceptable risks to human health.

Bayer baldly asserts that no reportable MIC release have occurred during their post-2002 ownership of the Institute plant, while again omitting the inconvenient fact that the air monitors were intentionally turned off before the August 28, 2008, and ignoring contradictory enforcement records. Nor does Bayer discuss the Settlement Agreement it agreed to relating to its failure to inspect underground MIC storage tanks at anytime between 2003 and 2009.

To these rehashed arguments, Bayer appends a totally spurious argument that the Fourth Circuit's recent decision in *North Carolina v. Tennessee Valley Authority*, 615 F.3d 291 (4th Cir. 2010), overrides the Clean Air Act savings clause's explicit provision that nothing in that act "shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. §7604 (e).

Lastly, Bayer concocts a straw man argument that it is the "start up" of the new MIC unit that is Plaintiffs' primary concern in this case.  In fact, as Plaintiff's Complaint and motion make clear, the primary safety risk associated with MIC is the storage of vast quantities of the highly unstable and toxic MIC, whether above ground or below.[1]

Thus, Bayer's assurances that it has completed all matters on the start-up checklist (including the items listed in their February 12, 2011 "Emergency Motion"), do not address the primary risk associated with the manufacture of MIC – the ongoing storage of MIC – as contrasted with the inherently safer "just in time" production technology employed by Bayer's competition, DuPont.

## II.   STATEMENT OF FACTS

A.   DEP Did Not Inspect Bayer's MIC Facility Before Issuing the January 5, 2001 Title V Clean Air Act Permit Approving The Current Facilities for the Manufacture And Storage Of MIC

The overriding fact relating to DEP's issuance of the January 5, 2011 permit to Bayer for MIC production – on which Bayer so strongly relies –  is that no one from DEP inspected Bayer's facility prior to issuing the permit.  As counsel for Bayer candidly acknowledged at the TRO hearing in this matter on February 10, 2011, in response to the Court's question:

THE COURT: Prior to this startup process which is underway now, was

---

[1] Elimination of above-ground storage at Institute, undoubtedly a protection against airborne "residue treaters," is emphatically not a panacea for MIC risks;  the MIC released in Bhopal 1984 was stored below ground.  New York Times, December 4, 1984, p. 4 (**Exhibit "A"**).

the facility physically inspected by anybody in government?

MR. FISHER: No, Your Honor.

Tr. at 33.[2]

This admission is, of course, remarkable given that the permit was for a new facility constructed to handle a highly unstable and extremely toxic hazardous material, methyl isocyanate (MIC), the prior facility having blown up some seventeen months prior to the DEP's casual issuance of a new permit.

But the August 28, 2008 explosion was not the only reason why DEP might have considered inspecting Bayer's MIC facilities.  On September 20, 2010, DEP and Bayer entered into a Consent Order relating to:

- 20 missing records (at least 3 of which related to Group 8 Phosgene, MIC and Sevin chemicals) for the years 2007 through 2009;

- 509 deviation events relating to missing or out of range control device parameters (at least 5 of which related to Group 8 Phosgene, MIC and Sevin chemicals),

- failure to maintain minimum 2% caustic concentration in the scrubber liquor flow for 9 days in 2007 and 2009 (Group 8 chemicals);

- failure to perform daily measurement of the caustic concentration in the scrubber liquor for 10 days in 2008, and

- failure to perform daily measurement of the caustic concentration  in the scrubber liquor for Sevin (a Group 8 chemical)  for 15 days in 2009.

Importantly, not one of these violations was discovered as a result of a DEP inspection, despite the fact that Title V Compliance audits were performed by DEP in all three years (2007 to 2009).   To be sure, EPA conducted Title V Clean Air Act (CAA) inspections on March 14, 2007 finding violations; DEP inspections the next day found none.  EPA Title V CAA inspections on April 11, 2006 found violations; DEP Title V inspections on October 3, 2007 found none.  February 29, 2008 inspections by EPA again found Title V violations; the October 30, 2008 DEP inspection (by DEP Division of Air Quality engineer

---

[2] References "Tr. at __" are to the transcript of the February 10, 2011 hearing in this matter.

Todd Shrewsbury) found Bayer in compliance.  Again, an October 30, 2009 inspection by DEP found no violation.[3]

One can speculate as to the reasons for DEP's inability to enforce the law against Bayer, but it is possible that DEP's enforcement record is simply a function of the agency's casual regulatory attitude. Rhodimet AT 88 is a brown viscous liquid with an acrid odor sometimes reported as smelling like French fries.  It is corrosive to eyes, and may cause skin and respiratory tract irritation.  Todd Shrewsbury, the DEP Division of Air Quality engineer who inspected Bayer in October 2008 without finding violation, stated in a Complaint Investigation Form dated March 23, 2010, with regard to a complaint taken by Homeland Security describing an odor as smelling like French fries, that "Most people wouldn't classify French fries odor as objectionable," and further states that he can't be certain that the Bayer facility was responsible.[4]

Importantly, the DEP permit on which Bayer relies now to foreclose judicial review was, like all else Bayer does, shielded from public review.  Specifically, by invoking the Title V Minor Modification procedure for permitting the only facility in the United States to manufacture and store MIC, Bayer avoided the entire panoply of public participation.  Specifically, CSR § 45-30-6.8 provides that:

> Except for modifications qualifying for minor permit modification procedures, all permit proceedings, including initial permit issuance, significant modifications, and renewals, shall provide adequate procedures for public notice including offering an opportunity for public comment and a hearing on the draft permit.

45 CSR 30.6 (emphasis added).

The public participation provisions which Bayer avoided by invoking DEP's minor modification permit procedure are extensive and are appended to this brief as an end note.[i]  They include the

---

[3] See Enforcement & Compliance History Online (ECHO), http://www.epa-echo.gov/cgi-bin/get1cReport.cgi?tool=echo&IDNumber=25112RHNPLROUTE  (**Exhibit "B"**).

[4] **Exhibit "C"** – Complaint Form dated March , 2010.

obvious notice and opportunity to request a public hearing, the right to comment and similar attributes

of due process.  But the detail of the public requirements should not obliterate the overriding question:

viz., How is it even conceivable that in a post-1984 Bhopal, post-2008 Institute, world, the DEP permit

for Bayer's construction of a new MIC manufacturing facility could qualify as a "minor modification."

Certainly DEP regulations do not contemplate such a result.  To be sure, the exact opposite is

clearly the case.  Section 6.5.b of DEP's Division of Air Quality regulations entitled "Significant

modification procedures," in subsection 6.5.b.1 recites the following criteria for significant modification:

> <u>Significant modification procedures shall be used for applications requesting</u>
> significant permit modifications that do not qualify as minor permit
> modifications or as administrative amendments including, but not limited
> to, the following:
>
> > 6.5.b.1.E.  <u>Proposed changes which</u> in the judgment of the Secretary
> > would <u>require decisions to be made on significant or complex issues
> > that generate or are likely to generate significant material adverse
> > comment from the public, affected states, or U.S. EPA</u> with respect to
> > the determination of applicable requirements or air quality impacts.

45 CSR 30, Section 6.5.b (emphasis added).

At a time when the CSB was busy preparing its detailed, seventeen month investigation and

report on the August 28, 2008 explosion, and the NAS was organizing to conduct a Congressionally

mandated inquiry into the inherent risks of locating an MIC manufacturing plant in a major population

center, DEP's acquiescence in a non-public, minor modification permit procedure for Bayer's new MIC

facility is simply stunning.  Surely, the interchange between the DEP and Bayer in that closed proceeding

cannot foreclose judicial examination of the result here, as Bayer suggests in its Opposition.

B.  <u>Bayers Assertion that the Newly Configured MIC Unit Satisfies All OSHA And EPA Process Safety And
    Start-Up Requirements Is Based Upon Incomplete Reports, and Bayer's Own Representations to
    ABSG, the "Independent" Auditor Who Expressly Disavows Any Third Party Reliance On Their Report</u>

Bayer assures this Court that it has passed inspection by ASBG, an independent auditor, whose

reports, dated July 2, 2010 and January 5, 2011, purportedly give a "green light" to turn on the newly-

configured MIC manufacturing unit at Institute.  Bayer attaches to its Opposition a July 2010 review of

Bayer's Process Hazard Analysis (PHA), and a January 21, 2001 Pre-Startup Safety Review, both

purportedly in compliance with OSHA and EPA requirements, and both prepared by ABSG Consulting

Group, Inc. (ABSG).

The 8-page July 2, 2010 PHA review states:

> The protective measures identified in the PHA are either already in
> place, or <u>are scheduled to be completed, prior to the restart of the MIC
> Unit in 2010</u>. However, we had <u>four findings</u> with respect to the
> documentation of the MIC Unit PHA.

Exhibit 2 to Bayer's Feb. 18, 2011 Opposition at p. vii (emphasis added).

As noted, the "findings" (exceptions to an otherwise "clean" report) related exclusively to

"documentation." But as this Court well knows, the "green" light given this project by ASBG directly

conflicts with the Defendant's own February 12, 2011 motion for emergency relief from the TRO.  That

motion provides a compelling litany of uncompleted tasks, including such basic matters as employee

training and writing of Standard Operating Procedures for the new MIC manufacturing facility.

What does the July 2, 2010 ABSG PHA review say about employee training and Standard

Operating Procedures?  Nothing.

The 5-page January 2011 PSSR includes an extraordinary "Notice," effectively a disclaimer, at the

beginning of the report.  The "Notice" states in unambiguous language that the conclusions are based

upon representations to ASBG by Bayer, and that anyone accepting or using the report releases ABSG

and BCS from liability for anything:

> This report was prepared by ABSG Consulting Inc. (ABS Consulting)
> solely for the benefit of Bayer CropScience, LP (BCS) in Institute, West
> Virginia. Neither ABS Consulting, BCS, nor any person acting in their
> behalf makes any warranty, express or implied, or assumes any liability
> to any third party, with respect to the use of any information or
> methods disclosed in this report. <u>Any third party recipient of this report,
> by acceptance or use of this report, releases ABS Consulting and BCS</u>

6

> <u>from liability</u> for direct, indirect, consequential, or special loss or damage, whether arising in contract, tort (including negligence), or otherwise.
>
> ABS Consulting and its employees, subcontractors, consultants, and other assigns cannot, individually or collectively, predict what will happen in the future. <u>The review team made a reasonable effort, based on the information provided by BCS personnel, to assess the pre-startup safety review (PSSR) for the Methyl Isocyanate Unit (MIC Unit)</u> with respect to the Institute site's process safety management (PSM) program and risk management program (RMP) and the requirements of the Occupational Safety and Health Administration's (OSHA's) PSM standard 29 CFR 1910.119 and Subpart D (the Accident Prevention Program Level 3 requirements) of the Environmental Protection Agency's (EPA's) RMP rule 40 CFR 68 as of December 2010.

Exhibit 3 to Bayer's February 18, 2011 Opposition at p. iii (emphasis added).

Because the July 2010 PHA review by ASBG had reviewed many matters, the January 2001 PSSR was confined to a "[r]eview [of] any engineering changes made and <u>confirm[ation] in a written report that all necessary protective measures are in place</u> and that an <u>appropriate pre-startup safety review has been completed</u>." Exhibit 3 - February 18, 2011 Opposition at p. 3 (emphasis added). Under Sec. 2.2 "Review Approach,"  ASBG states that the review team examined the organization, physical conditions, procedures, practices, and records in place at the MIC Unit at the time of the review. However, the January 2011 report states that:

> [T]he team did not conduct any operational tests.

Exhibit 3 to Bayer's February 18, 2011 Opposition at p. 3 (emphasis added).

The PSSR – based on representations of Bayer – concluded that all construction was completed appropriately, but stopped short of saying it had all been done.  Specifically, the PSSR acknowledged with regard to items remaining to be done that:

> [W]ith the completion of the punchlist items (about 95% complete at the time of this review), BCS's management systems **will** successfully meet the PSSR requirements prior to the MIC Unit startup in 2011.

Exhibit 3 to Bayer's February 18, 2011 Opposition at p. 6 (emphasis and bold added).

7

So how good was Bayer at following through with corrections from prior PHA's and PSSR's?

A 2004 Methomyl PHA Risk Sheet Action Plan (**EXHIBIT "D"** - BCS-006542-BCS-0006548) set a long list of specific safety issues; topics covered by the 28 action items included:

> # 1, failure of a level indicator in a tank,
>
> # 2 failure of a gauge reading lower than actual AO on a tank,
>
> #3 failure of a pressure controller,
>
> #5 risk of water in in chlorine transfer line that could lead to rupture, cholorine cloud, loss of life and "negative media,"
>
> #14 failure of a level indicator that could lead to rupture, and others –

all of which had a "target date" of "12/31/2008." Plainly, expedition was not the overriding concern in the 2004 "Risk Sheet Action Plan."

After the August 28, 2008 explosion, OSHA expressed an unusual degree of curiosity, if not suspicion, regarding the extended delivery dates for the risk items listed in the foregoing Risk Sheet Action Plan. Specifically, in a January 7, 2009, to which Bayer replied on January 9, 2009, OSHA requested:

> All documents and correspondence [r]elating to the selection of, and any change of, target dates for Methomyl risk sheet/action item numbered 25, 31, 35, 37, 40, 42, 45 & 46 from the dated[sic] of the completion of the 2004 PHA to date, including all dates on which target dates/resolution dates were changed, and all reasons for such changes. The request specifically includes, but is not limited to, all electronically stored responsive information , including information contained on the BAT System and on Excel Spreadsheets.

**Exhibit "E"** - BCS-006690.

The same suspicion was directed at Bayer's Facilitated Self Assessments (FSA) for 2004 and 2007. On November 29 2004 and January 4, 2005, Bayer employee Nathan Kimmerle, the Process Safety Coordinator, conducted an internal audit of the safety of the Larvin unit, mandated by OSHA, and on January 10, 2005 prepared a document (BCS **BATES 006633-006634 – Exhibit "F"**) titled "Institute

Methomyl-Larvin Facilitated Self Assessment-2004 (2004 FSA)." In his 2004 FSA, Mr. Kimmerle noted deficiencies in five areas relating to:

- Section 1 – Safety File Management Systems

-  Section 6 – Process Hazard Analysis

- Section 13 – Management of Change

- Section 14 – Incident Investigations

- Section 17 – Compliance Audits

**EXHIBIT "F"** - **BATES  006633-006634**.

On November 29, 2007, Ms. Karen Myers, Bayer's then Process Safety Coordinator, prepared a Summary Memorandum on the "Institute Methomyl-Larvin Facilitated Self Assessment-2007 (2007 FSA). Ms. Meyer's memorandum included a statement that "***This FSA is certified by the Bayer CropScience Process Safety Engineer who has been trained in Process safety Management auditing by ABS Consulting.***" (Bold and italics in original). **EXHIBIT "G"** – BCS 006483-6485.

In her 2007 FSA, Ms. Myers repeated – verbatim -- the five deficiencies reported in the 2004 FSA prepared by Nathan Kimmerle, her predecessor Process Safety Coordinator, i.e., the exact same deficiencies noted above in Sections 1, 6, 13, 14 and 17. **EXHIBIT "H"** – BCS 006510-006512

On January 7, 2009, four and a half months ***after*** the August 28, 2008 explosion at Institute, Jeff Funke, Area Director for the US Department of Labor/OSHA, requested documents from Bayer pertaining to the 2004 and 2007 FAS reports.  Compounding OSHA's apparent suspicions, was Ms. Myers' generation of a "corrected" FAS 2007, dated 9-2-08,[5] five days after the August 28, 2008 explosion. In her "corrected" FAS 2007 prepared five days after the explosion that killed two Bayer employees, Ms. Myers, Bayer's incumbent Process Safety Officer, listed an entirely new array of

_____

[5] It is unclear whether the document dated "9-2-08" is the only "corrected" 2007 FSA.  Two emails dated 9-1-08 and 9-2-08 referred sequentially to separate documents bearing the same dates as the emails, i.e., 9-1-8.doc and 9-2-08.doc.  See BCS -006661 and BCS-006662 (**Exhibits "J" and "K"**).

"Findings" (i.e., deficiencies).   On September 2, 2008, Ms. Myer's "corrected" report found new

deficiencies relating to:

- Section 3 – Process Safety Information – Chemicals, in which she now reported that "max" inventories for PSM chemicals need added to SOP in Section 4 B. Currently it points to the SARA reports.

- Section 4 – Process Safety Information – Technology, in which Bayer's resident Process Safety Coordinator reported "Chemical/Chemical and Chemical/MOC Matrix's could not be found easily – need to find.  Add major accidents and histories to the SOP."

- Section 5 – Process Safety Information – Equipment, in which the diligent Process Safety Coordinator determined that "SOP needs updated with new control systems.  Need to document new equipment is designed per standards and codes – per M I. PSV safety records need generated."

- Section 6 – Process Hazard Analysis, in which Bayer's 2007 Process Safety Coordinator appends to the four findings of deficiencies (seemingly copied from the 2004 FAS), the puzzling statement "No findings."

- Section 7 – Standard Operating Procedures, in which Ms. Myers, in lieu of the prior "no findings" and "all minimum standards met" and "many best practices in place" now opines that " SOP's are still in draft and needs [sic] issued. Tom Foxworth signed COP's [sic]."

- Section 8 – Training.  [No change in FSA, and noted here only because Ms. Myers original and "corrected" 2007 FSA reported "No findings" on this topic which the CSB underscored as a primary cause of the August 28, 2008 explosion and consequent deaths of two Bayer employees]

- Section 9 – Contractors.  Initially no findings, now recites that "Contractor evaluation forms are filled out by TA's needs, sent to contract administrator – these need completed once work is completed."

- Section 10 – Pre-Startup Safety Review.  [No change in FSA.  Noted here for contrast with CSB pre-startup findings of gross deficiencies at p. 109 of January 20, 2011 report (Plaintiffs' Exhibit Volume Bates No. 117).  Myer reported in her original and "corrected" FSA the following:   "No findings – all minimum standards met, many best practices in place." ]

- Section 11 – Mechanical Integrity.  In lieu of the prior "No findings. All minimum standards met. Many best practices in place," Bayer's ever thorough Process Safety Coordinator, states "MI procedure in draft needs issued. Need to look at CBI for vessel program and how to take it into the future. Control systems MI records need to have date/inspector's name/type of test and results recorded –

MI system is going to make a STAMP.  MI system need to resolve documentation of action tracking of deficiencies – BATS Work Orders.

- Section 12 -- Work Permits [Unchanged from original].

- Section 13 – Management of Change.  To the two prior findings of deficiencies, Ms Myers appends "No findings."

- Section 14 – Incident Investigations.  To a single prior investigation, Myers add two more: "Investigation documentation needs to improve – over the 24 hours. BATS issues with not putting action items into the system."

- Section 15 – Emergency Plans.  In place of prior "No findings" Myers substitutes "Need to get the annual HAWOPER awareness training in CBT for operations."

- Sections 16, 17, and 18 – no change in "corrected" FSA from original.

The multiplicity of FSA reports, and the very extended due dates on the 2004 PHA, caused OSHA to send an extended document request to Bayer, and to depose and/or interview a number of Bayer officials and employees.  The records of the OSHA investigation are the subject of an FOIA request filed by Plaintiff Maya Nye.  Documents are not yet available, and Plaintiffs reserve the right to supplement this Reply.

The foregoing Bayer records provide context for ASBG's[6] comprehensive disclaimer of liability, and explicit attribution of their conclusions as to the readiness of the Institute facility to reliance on representations from Bayer.[7]

---

[6] ASBG is indentified as the entity that provided training to Bayer personnel on how to conduct a Facilitated Self Audit.

[7] It is clear that Bayer attaches substantial significance to disclaimers, even disclaimers much milder than that appended by ASBG.  Thus, in response to Plaintiffs' Request for Admission that Exhibits "P" and "R" to this Reply fairly and accurately depicted the demographics for the geographic areas depicted, Bayer stated that it did not have sufficient information to admit or deny, adding: "The report indicates it was generated using data from government sources "deemed reliable," but also states "We cannot assume responsibility for its accuracy." As BCS does not believe it has retained BuyDemographics.com to conduct a demographics report, it has no way to verify that the processes utilized by BuyDemographics.com are accurate. Furthermore, based on the disclaimer – "we cannot assume responsibility for its accuracy" there is no way to make such a determination." **EXHIBIT "L"**

C.  Bayer's Claim That There Has Been No Reportable Release Of MIC During Bayer's Operation Of Institute Facility Is Contradicted by the EPA ECHO data base

The reporting threshold for releases of MIC is 500 pounds per year (EHS - EPCRA 302), or 10 pounds in any individual release (CERCLA and EHS - EPCRA 302).  Bayer's claim that no reportable releases have occurred in the years of their ownership (from 2002 to present) is contradicted by EPS's Enforcement and Compliance History Online (ECHO) report for the Institute facility, which records the following releases of MIC by Bayer:

| Year   | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 |
|--------|------|------|------|------|------|------|------|
| Pounds | **614** | 462 | **562** | 429 | 403 | 388 | 380 |

**EXHIBIT "B"**

## II.  ARGUMENT

A.  Anticipatory Nuisance

The notion of injunctive relief based upon anticipated nuisance appears in English common law at least as far back as 1816[8],  and early 19th Century cases explicitly endorsed a judicial calculus in which the scale of a potential catastrophic event is weighed against the likelihood that it will occur.  Thus, in *Earl of Ripon v. Hobart*, Lord Chancellor Brougham stated:

> "[T]he law cannot make over-nice distinctions, and refuse the relief merely because there is a bare possibility that the evil may be avoided. Proceeding upon practical views of human affairs, the law will guard against risks which are so imminent that no prudent person would incur them, although they do not amount to absolute certainty of damage. Nay, it will go further, according to the same practical and rational view, and, balancing the magnitude of the evil against the chances of its occurrence, it will even provide against a somewhat less imminent

---

[8]  "805. The Court may in its discretion grant an injunction prohibiting the commission, continuance, or repetition of a tort; but in a quia timet action brought to restrain the commission of an apprehended tort, the  Court will not grant an injunction unless there is a strong probability that the apprehended loss will actually arise/**^   (a) Crowdir v. Tinkler (1816) 19 Ves. 622. (b) Earl of Ripon v. Hobart (1834) 3 Myl. & K. 169.  A, G. V. Corp. of Manchester [1893] 2 Ch. 87.  A. G. V. Corp. of Nottingham [1904] i Ch, 673." EDWARD JENKS, MA., B.C.L.,"*A Digest of English Civil Law*," Book II, Par III, Law of Quasi-Contract, p. 374.

probability in cases where the mischief, should it be done, would be vast and overwhelming.

*Earl of Ripon v. Hobart,* 40 Engl. Rep. 65, 68, 3 My. & K. 169. '2 3 My. & K. 176 (1834).

The principle of weighing risks and potential outcomes has made its way into the Restatement (Second) of Torts, § 933,[ii] comment b in which it is recognized that:

> The seriousness and imminence of the threat are in a sense independent of each other, since a serious harm may be only remotely likely to materialize and a trivial harm may be quite imminent. Yet the two elements must be considered together in the decision of any given case. The more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote.

Restat 2d of Torts, § 933.

The Restatement's balancing of risk and potential was cited in *Village of Wilsonville v. SCA Services*, 426 N.E.2d 824, 836, 842 (1981), and both the Restatement and *Village of Wilsonville* are cited approvingly in *Duff v. Morgantown Energy Associates*, 421 S.E.2d 253, 187 W.Va. 712, n.10 (1992), the leading nuisance case in this state.   *Village of Wilsonville*, in the concurring opinion of Justice Ryan, explicitly applied the likelihood/catastrophic consequences test to enjoin the activity involved in that case.

Similarly, the Supreme Court of Oklahoma, in *Sharp v 251st Street Landfill, Inc*. 810 P. 2d 1270, 1272 (Okla. 1991) enjoined the creation of a landfill that threatened to leach into the water table, in advance of it having done so, because it would be impossible to remedy after the fact, and in the absence of anything approaching the certainty that has attended many older, pre-industrial revolution cases, the most wooden of which populate Defendant's brief in opposition to a preliminary injunction.

Also instructive in this case is *Salter v. B.W.S. Corporation, Inc.,* 290 So.2d 821 (La. 1974), in which the defendant was "enjoined to conduct its operations in compliance with standards recommended by its experts which will prohibit the escape of noxious substances on the property of its

neighbors." Id. at 825.  In *Salter*, the evidence established a probability that disposal of chemical waste on the defendant's property, without adequate precautions, would pollute the plaintiff's well. Simultaneously, there was evidence that the defendant's operation could be conducted safely "if the recommendations relative to ensuring that the trenches are lined with an impermeable material are followed."  The Lousianna Supreme Court recited that they had "only the plans of the defendant and the beginning of its operation," and that mere fear could not prevent the establishment of a business, adding:

> However, the consequences of failure to exercise great care to prevent the escape of poisonous materials are so serious…that we deem it appropriate to issue a qualified injunction….Although the record shows only that the violation of recommended engineering procedures will result in damage to neighbors, the consequences of escaping poisonous materials are so terrible that the injunctive relief is appropriate.

Id. at 825.

In the present case, Plaintiffs have not sought a flat injunction against manufacture of MIC.  The Complaint explicitly recites that the manufacture of MIC should not commence unless and until the very specific recommendations of the Chemical Safety Board, intended to correct identified deficiencies in the procedures that led up to the August 28, 2008 explosion are corrected.

The additional, and in no way subordinate, condition Plaintiffs include in the conditions for allowing Bayer to go forward is the completion of the Congressionally mandated study of the inherent risks of a manufacturing process that, 26 years after the Bhopal disaster, continues to rely on the storage of vast quantities of MIC next to a university with a day-time population of 2,500 students (and a night-time population of 650 – to be added to the 836 population reflected in Bureau of the Census data as residing within a mile of the MIC facility.

A different question might be presented if Bayer had -- like virtually every other chemical manufacturer in the world promptly after the 1984 catastrophe -- adopted some variation of the

inherently safer DuPont "just-in-time" technology which only produces MIC in volumes that can be immediately consumed by other chemical processes, effectively eliminating the risks associated with storage of MIC, a very unstable, highly toxic chemical.

Edward A. Munoz, the former Managing Director of Union Carbide India, Limited, who constructed the Bhopal MIC plant, has stated that the decision to build an MIC plant with large storage capacity was wrong because:

> MIC is very unstable chemical. It traumatizes without notice and with evolution of a lot of heat the traumatization can be very explosive nature which only can control only to a certain point and simply it is very dangerous product to store. I mean, I, me and a lot of other people including Beyer, a chemical company for instance or including an environmental people in France, equivalent of our environmental agency here--they think that you shouldn't store it.

> [W]e preferred to have a plan that will consume the MIC that was created and if you have store small amounts of MIC will use 55 gallon drums and which if they go berserk they don't cause too much problem. It can be contained in a scrubber in the plant, the solution we have found for France the same, you know. But South Charleston engineers just loved the big tank, you know, and they build it. They build after I have left.

> [T]hey felt that they could control the MIC, that they knew all about it. That MIC if kept in a stainless steel tanks with a small allowance of phosgene and a that inhibit traumatization and if you can keep it cool enough--it was pretty safe to handle. And they mention the record of the South Charleston plant, where they didn't have any problem. They forget that South Charleston there was no choice but to build storage tanks because the main use of the phosgene of the MIC in South Charleston was merchant. Was to sell to FMC and DuPont and have they a plan that was at that time very unreliable and was more down than working.

> JK: What do you think the lessons of Bhopal are?

> EM: Don't store MIC. Don't store dangerous chemicals. Particularly if you have alternatives.

**EXHIBIT "M"** - CorpWatch: INDIA: Setting the Record Straight.
http://www.corpwatch.org/article.php?id=11735&printsafe=1  last visited March 3, 2011.

At the first meeting, in Washington, DC, of the National Academy of Science committee to conduct the Congressionally mandated study of the inherent risks of manufacturing MIC, John B. Carberry, Dupont's director of process R & D, charged with developing Dupont's response to Bhopal, said:

> "I remember the day extremely well. The accident occurred on Dec. 3, 1984, at 1 AM; it was 3 PM in the eastern U.S. There was high-profile media coverage by the then-new Cable News Network. There were between 1,500 and 8,000 immediate deaths. We figured DuPont shipments of MIC would be stopped in the U.S. for a good long time. We were wondering how we will stay in business." At the time, DuPont was dependent on MIC that was made at a non-DuPont factory in Belle, W.Va., and shipped to DuPont's LaPorte, Texas, facility, where it was used to formulate two pesticides that were a strong business for DuPont, Carberry explained. The company had but a few months' worth of MIC. "It was a grim picture," he said. "We knew the company could no longer ship or store MIC on-site in large quantities." Carberry, who retired from DuPont in 2007, described a commitment by senior engineers to develop a new manufacturing method using, basically, a just-in-time production system that tied two reactors together, one formulating MIC and the other using it. "We had MIC in a pipe that was only a few feet long and carried between 0.5 and 2 lb of MIC at any time." They got the process working in June 1985, six months after Bhopal. Carberry credits the commitment by company engineers, a "model" plant manager at LaPorte who had support from regulators and the community, and a highly motivated company that wanted to address MIC use.

**Exhibit "N"** (emphasis added).

And Dupont was not alone in adopting inherently safer technology.  The 1991 edition of SRI's *International Chemical Economics Handbook*, lists 13 manufacturers of MIC world-wide, only one of which, Rhone-Poulenc in Institute, WV, employed large scale MIC storage. (**Exhibit "O").**

Also speaking at the February 22, 20011 NAS meeting in Washington, DC was Steven Smythe, a Bayer chemical engineer, who testified that the company considered for alternative modes of production to eliminate or reduce the storage and use of MIC.   Smythe speech makes clear that, in August 2009, Bayer chose to build a new MIC plant at the Institute chemical facility based upon a

16

technology known to be very dangerous – and consciously chose not to employ available, inherently safer technology – for the sole purpose of maximizing its profitability, regardless of the risks of serious injury and loss of life to the citizens of the Kanawha Valley.

Chemical Engineering News reported on February 21, 2011 that Smythe stated that:

> None of the approaches, however, was adequate for Bayer, he said. Since the 2008 accident, Bayer has reduced the amount of MIC stored at Institute by 80%, he said. It had stored nearly three times the amount leaked in Bhopal. Even with the reduction, the company still stores about 48,000 lb of MIC on-site, more than half of the 88,000 lb thought to have leaked in Bhopal.  <u>The phaseout decision was not driven by safety, Smythe said. Instead, it was based on "strategic and economic considerations" and a global corporate effort to replace aging pesticides with new compounds</u>. Bayer will eliminate products using carbamate chemistries that depend on MIC, according to him.  Smythe explained that such carbamate products lack a "long time horizon" and more company investments could not be justified, hence the decision to eliminate the pesticide products.  <u>"We believe we've got a safe system at Institute,"</u> he continued, <u>"but in the end, the announcement of this January that we are going to stop making MIC in West Virginia makes this point moot."</u>

**Exhibit "N"(**emphasis added).

The safety of MIC production at Institute is not moot to the 836 full-time and 2,500 day-time residents who live within one mile of Bayer, or to the 11,390 residents within 2 miles, or the 71,712 residents within 5 miles. (**EXHIBIT "P"**) For these citizens of the United States, the threat of chemical annihilation is a real, day-to-day fact of life.  They are aware of the many similarities between their community and the community of Bhopal in 1984.

A July 2010  article (See **PLAINTIFFS' EXHIBIT 1**, Admitted into evidence February 18, 2011) by the California EPA on Methyl Isocyanate recites that 30 to 45 metric tons of MIC was released at Bhopal in December 1984 within 45 to 60 minutes. The contents of tank spread a cloud over a large, densely-populated area of 40 kms, or 24.85 miles -- virtually identical in size to the 25 mile radius Bayer identified as the "zone of vulnerability" in its EPA mandated Offsite Consequences Analysis appended to

17

their Risk Management Program (and in which between 300,912 and 310,744 citizens of the Kanawha Valley reside).

A Rhone-Poulenc study (**EXHIBIT "Q"**) of the worst case scenario in 1994 placed the zone of risk at 9 miles, in which some 142,477 individuals reside. (**EXHIBIT "R").**

The California EPA article relates that atmospheric inversion and a low wind speed prevented dispersion of the gas. Because of the wind direction, the area with the largest number of dead and severely injured was 7 kms, or 4.35 miles from the plant (86 % of the 5 mi. area around Institute in which more than 70,000 persons reside. "Evidence of the Developmental and Reproductive Toxicity of Methyl Isocyanate," July 2010, Reproductive and Cancer Hazard assessment Branch of Office of Environmental Health Hazard Assessment, California EPA. See **PLAINTIFFS' EXHIBIT 1**, Admitted into evidence February 18, 2011.

And the CSB has recently released, albeit reluctantly, its own analysis (**EXHIBIT "S"**) of the likely consequences of the August 2, 2008 explosion, based upon assumptions of release of MIC in alternative scenarios.

CSB's Scenario A assumed the rupture of a 1.5 inch pipe and the release of 13,700 pounds (15 % of the 88,000 pounds release at Bhopal, but equal to the volume of the above-ground MIC day storage tank located 70-80 feet from Bayer's airborne "residue treater"), with a 1.12 mph wind blowing directly south in the direction of the Kanawha River, opposite Jefferson, WV.  The distance at which MIC was dispersed in a concentration deemed immediately dangerous to life and health (IDLH) was 6162 feet, or 1.2 miles.  The outer limits at which MIC was dispersed in toxic amounts was set at 20,684 feet, or 3.9 miles.

CSB Scenario B assumed a release at 20 feet above grade of 560 pounds (0.6% of the 88,000 pounds released in Bhopal), again with a windspeed of 1.12 mph directly south.  The distance at which

MIC was dispersed in IDLH concentration was 5,750 feet (1.2 miles), the maximum toxic dispersal was to 14864 feet, or 2.8 miles.

It should be noted that both of the CSB scenarios project IDLH concentrations at more than one mile, an area that encompasses the day-time population of 2,500 students at West Virginia State University, plus whatever portion of the 836 census based full-time resident population happens to be home during the day; at night the WVSU resident population of 650 is added to the 836 census population.

The striking feature of the two CSB scenarios, which were intended to model the results of a leak on August 28, 2008, is the minimal amount of MIC assumed to be released. In August 2008, Bayer stored 200,000 pounds of MIC at Institute, 2 ½ times the 88,000 pounds released at Bhopal. Although the 13,000 pound assumption has an obvious nexus to the volume of the above-ground "day tank," there is no obvious analytical purpose served by the assumption of a 560 pound release in scenario B. Moreover, the August 2008 release was coupled with an explosion and fire that burned for four hours at temperatures that would have caused MIC to decompose into additional highly toxic chemicals, including HCN (hydrogen cyanide) with independent lethality ranges and, consequently, potential for deaths, instant or otherwise.

Plainly, the citizens in the inner ring of this potential inferno suffer risks different from those at the outer reaches, in a manner to support a finding of special effect and, thereby, a finding of public nuisance. And their fears are sufficiently real to constitute such a nuisance.

B.  Preemption

To its TRO arguments, Bayer appends a claim that the Fourth Circuit's recent decision in *North Carolina v. Tennessee Valley Authority*, 615 F.3d 291 (4th Cir. 2010), overrides the Clean Air Act clause's explicit savings provision that nothing in that act "shall restrict any right which any person (or class of

19

persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief."  42 U.S.C. §7604 (e).

Bayer's argument for preemption of a state cause of action for common law nuisance was already foreclosed by the Supreme Court in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), involving the Clean Water Act's verbatim analogue of the Clear Air Act's savings clause.   In that case, which rejected the attempt to impose Vermont effluent limitations on New York sources, the Supreme Court explicitly held that the Clean Water Act's savings clause permitted plaintiffs a state common law nuisance remedy:

> Our conclusion that Vermont nuisance law is inapplicable to a New York point source does not leave respondents without a remedy. The CWA precludes only those suits that may require standards of effluent control that are incompatible with those established by the procedures set forth in the Act. The saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State. By its terms the CWA allows States such as New York to impose higher standards on their own point sources, and in *Milwaukee II* we recognized that this authority may include the right to impose higher common-law as well as higher statutory restrictions. 451 U.S., at 328, 101 S.Ct., at 1798 (suggesting that "States may adopt more stringent limitations . . . through state nuisance law, and apply them to in-state dischargers"); see also *Committee for Jones Falls Sewage* System v. Train, 539 F.2d 1006, 1009, and n. 9 (CA4 1976) (CWA preserves common-law suits filed in source State).

479 U.S. 497-498.

Bayer's Clean Air Act preemption theory was squarely presented and explicitly rejected in the Sixth Circuit's decision construing the Clean Air Act and a state cause of action for nuisance in *Her Majesty the Queen v. City of Detroit*, 874 F.2d 332 (6th Cir. 1989).  The Sixth Circuit, directly referencing the Supreme Court's decision in *International Paper Co.*, stated:

> Finally, that Congress did not seek to preempt actions such as involved in this appeal is clearly indicated by the Court's holding in International Paper Co. v. Ouellette, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883

20

(1987). In International Paper, the Court held that a savings clause in the Clean Water Act, 33 U.S.C. Sec. 1365(e), which defendants concede is identical to the savings clause at issue in this case, allows state law actions against water pollution notwithstanding the existence of federal law and standards. The Court held that the savings clause "negates the inference that Congress 'left no room' for state causes of action;" it "specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the source State." Id., 479 U.S. at 492, 496, 107 S.Ct. at 812, 814. The Court did find that Vermont plaintiffs could not sue the New York defendant under Vermont law but, instead, had to proceed under law of the source state. Id., 479 U.S. at 494-98, 107 S.Ct. at 813-14. In the present consolidated cases, however, the plaintiffs are suing a Michigan facility under Michigan law.

The district court held that International Paper was distinguishable. First, the district court noted the Supreme Court had not addressed the International Paper plaintiffs' air pollution claims. However, there was no reason to think that the result with regard to air pollution should be different. The opinion indicates that the air pollution claims were simply not before the court. Id., 479 U.S. at 484, 107 S.Ct. at 807 n. 2. Moreover, on remand, the International Paper district court did hold that the air pollution claims could proceed, concluding that the Supreme Court's holding applied equally to them. See Ouellette v. International Paper Co., 666 F.Supp. 58, 62 (D.C.Vt.1987).

The district court attempted to distinguish International Paper on the ground that the plaintiffs had not only asserted several claims under state law, but also alleged a violation of defendants' Clean Water Act permit. However, the Supreme Court's opinion does not mention the allegation of a federal permit violation, let alone indicate that it was of any importance. Had the Court meant to impose this type of qualifier, it surely would have said so.

In our view, the argument cuts the other way, because if anything, one would assume that there is less reason to allow a state action to proceed if there is a companion federal violation. If anything, the action in International Paper had more of a federal character to it than the ones before us.

874 F.2d 343-344.

The Fourth Circuit opinion in *North Carolina v. Tennessee Valley Authority* reversed the U.S.

District Court for North Carolina's application of North Carolina statutory emission limits to TVA's out-of-

state sources (i.e., coal-fired electric plants in Alabama and Tennessee), as violative of the Supreme

Court's "multiplicity" doctrine announced in *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987).  In

short, the decision does nothing more than reaffirm the long-standing rule that one state's air emission

limits cannot be applied to sources outside that state, a situation factually distinguishable from the one

presented in this case which involves two counties (Kanawha and Putnam) in a single state, rather than

three states (NC, TN and AL).

And Bayer's distorted reading of the judicial parsley in *North Carolina v. Tennessee Valley*

*Authority* – the extended dissertation on why judges, who lack access to technical expertise, should

defer to administrative agencies purportedly possessed of the necessary technical skills -- would require

this Court to ignore the recommendations of the January 20, 2011 Chemical Safety Board (CSB)'s

seventeen month study of the August 28, 2008 explosion, and disregard the Congressionally mandated

National Academy of Science (NAS) study of the inherent risks of MIC production in a major population

center -- all out of deference to the presumed superior technical expertise of the West Virginia

Department of Environmental Protection (DEP).  This result literally turns the "deference" analysis of

*North Carolina v Tennesse Valley Authority* on its head.

Specifically, unlike the elaborate interstate "compact" that has been constructed over decades

to deal with discharges of NO, $SO_2$ and particulate matter, the regulation of MIC storage is confined to

the one place it happens – West Virginia.  And what do West Virginia DEP regulations have to say about

MIC? See 45 CSR 30 (**Exhibit "T"**).   The word appears exactly one time and then not in a complete

sentence.  Similarly, the word MIC nowhere appears in the hazardous material regulations of West

Virginia. See 45 CSR 25 and 45 CSR 34 (**Exhibits "U" and "V"**).

But the invocation of the need for technical expertise resonates very strongly with these

Plaintiffs; that is why they have predicated their Complaint on the proposition that allowing Bayer to go

forward – without implementing the recommendations of the CSB study or awaiting the results of the NAS study – constitutes a nuisance justifying invocation of this Court's equitable powers.

C. Public Interest

The Motion for Preliminary Injunction provided all discussion necessary of the public interest in continued production of TEMIK -- summed up in the singular fact that EPA has demanded Bayer halt sales of TEMIK because it represents an unacceptable risk to human health.

Bayer's playing of the "jobs" card is, in the context of this case in particular, simply galling.  Bear in mind that Bayer had already passed out pink slips to 220 of its workers, albeit marked for early delivery, before this lawsuit was filed.  Aware of the lameness of its argument, Bayer now avers that it is the sudden transition to unemployment, not unemployment *per se*, that is a matter of such public interest in this suit that it warrants exposing tens of thousands of the citizens of the Kanawha Valley to substantial risks, in the language of government regulations, risks of "immediate danger to life or health."   One resists the obvious: that instant unemployment beats instant death.   To be sure, a discussion of the recurring "jobs" canard of West Virginia politics is warranted, but this not the forum for that argument.

One does wonder what nice things Bayer contemplated for its soon-to-be ex-employees, and why whatever the nice going away package is, can't be delivered on any date other than the date Bayer initially contemplated.   And one cannot fail to ask whether the 220 persons who are losing their livelihood are victims of litigation or, alternatively, of the selfish short term interests of a corporation who, a quarter of a century after Bhopal, still resists adoption of an obviously and inherently safer technology.

### III.    CONCLUSION

Continued production of a pesticide for eighteen months, cannot under any calculus justify the inherent danger of the production of MIC, by this defendant, in the middle of day-time population center that includes within a 1 mile radius the 2,500 students of West Virginia State University, the 700 employees of Bayer, and 836 residents.  The calculus of lives at risk expands exponentially at 2 miles to an additional 10,000 people.  At 5 miles, more than 70,000 lives are at risk.  What conceivable economic benefit – over the next 18 months – could possibly justify the very real risk of chemical annihilation for these citizens?

No citizen should be required to accept Bayer's self-serving assurances that "all is well" assurances – by now well-worn pablum – which is contradicted by the day-to-day reality of Bayer's intrusion into, and disruption of normal life in, Institute, WV.  Bayer's highly visible 2009 confession to the US Congress of its dissembling with the CSB and the public is now not an isolated instance of corporate self protection.  The documents produced in this litigation, and Bayer's pleadings with this Court, make it plain that deception and lies is an inherent part of the corporate culture that is Bayer CropScience.

At the commencement of this litigation, Plaintiffs posed the litigation problem simply: After a party has admitted that it lied once (and only then after it was caught in the lie), how can anyone thereafter determine if any statement from that party is true or false.   The litany of lies produced in this suit makes the corollary an inevitable conclusion:  Bayer too is incapable of knowing the difference between the truth and a lie.

Plaintiffs have sustained their burden in this litigation; the resumption of MIC production at Institute will constitute a private and public nuisance and should be preliminarily enjoined at least until the full panoply of CSB recommendations have been implemented, and the NAS study of the inherent

risks of MIC production in a population center are available to this Court and the Kanawha Valley community as a whole.

Respectfully submitted,

/s/William V. DePaulo
William V. DePaulo, Esq.  #995
179 Summers Street, Suite 232
Charleston, WV 25301
Tel: 304-342-5588
Fax: 304-342-5588
william.depaulo@gmail.com

Counsel for Plaintiffs

—————————————————                                    ENDNOTE

[i]      6.8.a.  Public notice.

     6.8.a.1.  Scope:

       6.8.a.1.A.  Public notice shall be given that the following actions have occurred:

         6.8.a.1.A.1.  A draft permit has been prepared.

         6.8.a.1.A.2.  A hearing has been scheduled pursuant to this rule.

       6.8.a.1.B.  Public notices may describe more than one (1) permit or permit part.

     6.8.a.2.  Timing:

       6.8.a.2.A.  Public notice of the preparation of a draft permit shall allow at least thirty (30) days for public comment.  Upon request of the permit applicant the public comment period may be extended for an additional thirty (30) days.  Further extension of the comment period may be granted by the Secretary for good cause shown but in no case may the further extension exceed an additional thirty (30) days.

       6.8.a.2.B.  Public notice of a public hearing shall be given at least thirty (30) days before the hearing.  Public notice of the hearing may be given at the same time as public notice of the draft permit and the two (2) notices may be combined.

     6.8.a.3.  Methods.  Public notice shall be given by the following methods:

       6.8.a.3.A.  By mailing a copy of a notice to the following persons (any person otherwise entitled to receive notice under this paragraph may waive his or her rights to receive notice for any classes and categories or permits):

         6.8.a.3.A.1.  The applicant;

         6.8.a.3.A.2.   Any other State or Federal agency which the Secretary knows has issued or is required to issue a permit for the same facility or activity under the Federal Resource Conservation and Recovery Act (RCRA) or other relevant statutes;

         6.8.a.3.A.3.   Federal, State, and interstate agencies with jurisdiction over public health and the environment, the State Historic Preservation Unit of the Department of Culture and History when new site acquisition is involved, and other appropriate government authorities, including the Federal Land Manager when Federal Class I areas, as defined in 45CSR14, are potentially affected;

6.8.a.3.A.4.  Persons on a mailing list developed by:

6.8.a.3.A.4.(a).  Including those who request in writing to be on the list;

6.8.a.3.A.4.(b).  Soliciting persons for "area lists" from participants in past permit proceedings in that area; and

6.8.a.3.A.4.(c).  Notifying the public of the opportunity to be put on the mailing list through periodic publication in the public press and in such publications as regional and State funded newsletters or environmental bulletins.  (The Secretary may update the mailing list from time to time by requesting written indication of continued interest from those listed.  The Secretary may delete from the list the names of any person who fails to respond to such a request.)

6.8.a.3.A.5.  Any unit of local government having jurisdiction over the area where the facility is proposed to be located.

6.8.a.3.B.  By the Secretary publishing the public notice as a Class I legal advertisement in a newspaper in general circulation for the county where the emission will occur.

6.8.a.3.C.  Any other method reasonably calculated to give actual notice of the action in question to the persons potentially affected by it, including press releases or any other forum or medium to elicit public participation.

6.8.a.4.  Contents:

6.8.a.4.A.  All public notices.  All public notices issued under this rule shall contain the following minimum information:

6.8.a.4.A.1.  Name and address of the Division of Air Quality;

6.8.a.4.A.2.  Name and address of the permittee or permit applicant and, if different, of the facility or activity regulated by the permit, except in the case of general permits;

6.8.a.4.A.3.  A brief description of the business conducted at the facility or activity described in the permit application or in the draft permit, when there is no application;

6.8.a.4.A.4.  Name, address, and telephone number of a person from whom interested persons may obtain further information, including copies of the draft permit or draft general permit, fact sheet, and the application;

6.8.a.4.A.5.  A brief description of the comment procedures required by subdivisions 6.8.b and 6.8.c and the time and place of any hearing that will be held, including a statement of procedures to request a hearing (unless a hearing has already been scheduled) and other procedures by which the public may participate in the final permit decision; and

6.8.a.4.B.  Public notices for hearings.  In addition to the requirements of subparagraph

27

6.8.a.4.A of this section, public notice of a hearing shall contain the following information:

6.8.a.4.B.1.  Reference to the date of previous public notices relating to the permit;

6.8.a.4.B.2.  Date, time, and place of the hearing; and

6.8.a.4.B.3.  A brief description of the nature and purpose of the hearing, including the applicable rules and procedures.

6.8.a.4.B.4.  In addition to the general public notice described in subparagraph 6.8.a.4.A of this legislative rule, all persons identified in paragraph 6.8.a.3 of this section shall be mailed a copy of the fact sheet, if any, and notification of where to inspect or how to receive a copy of the draft permit and application.

6.8.b.  Public comments and requests for public hearings.

During the public comment period provided under paragraph 6.8.a, any interested person may submit written comments on the draft permit and may request a public hearing, if no public hearing has already been scheduled.  The Secretary shall grant such a request for a hearing if he concludes that a public hearing is appropriate after consideration of the criteria in paragraph 6.8.c.1.  A request for a public hearing shall be in writing and shall state the nature of the issues proposed to be raised in the hearing.  All comments shall be considered in making the final decision and shall be responded to as provided in paragraph 6.8.c.

6.8.c.  Public hearings.

6.8.c.1.  The Secretary shall hold a public hearing whenever he or she finds, on the basis of requests, a significant degree of public interest on issues relevant to the draft permit(s).  The Secretary may also hold a public hearing at his or her discretion, whenever, for instance, such a hearing might clarify one (1) or more issues involved in the permit decision.

6.8.c.2.  Any person may submit oral or written statements and data concerning the draft permit.  Reasonable limits may be set upon the time allowed for oral statements, and the submission of statements in writing under paragraph 6.8.a.2 shall automatically be extended to ten (10) days after the close of any public hearings under this section.

6.8.c.3.  A tape recording or written transcript of the hearing shall be made available to the public, upon request.

6.8.c.4.  Any public hearing required under the provisions of this subsection shall be held in the general area or the county in which a facility is located.

6.8.d.  Reopening of the public comment period.

6.8.d.1.  If any data, information or arguments submitted during the public comment period raise substantial new questions concerning a permit, or if as a result of comments submitted by

28

someone other than the permit applicant, the Secretary determines to revise any condition of the permit that has been subject to initial public notice, the Secretary shall take one (1) or more of the following actions:

6.8.d.1.A.  Prepare a new draft permit, appropriately modified, under section five of this legislative rule;

6.8.d.1.B.  Prepare a revised fact sheet under subsection 6.9; or

6.8.d.1.C.   Reopen or extend the comment period under paragraph 6.8.a to give interested persons an opportunity to comment on the information or arguments submitted.

6.8.d.2.   Comments filed during the reopened comment period shall be limited to the substantial new questions that caused its reopening.  The public notice shall define the scope of the reopening.

6.8.e.  Response to comments.

6.8.e.1.  At the time that any final permit is issued, the Secretary shall issue a response to comments.  This response shall:

6.8.e.1.A.  Specify which provisions, if any, of the draft permit have been changed in the final permit decision, and the reasons for the change; and

6.8.e.1.B.  Briefly describe and respond to all significant comments on the draft permit raised during the public comment period, or during any hearing.

6.8.e.2.  The response to comments shall be delivered to any person who commented or any person who requests the same.

6.9.  Fact sheet.

6.9.a.  A fact sheet shall be prepared for every draft permit (including general permits) and for every facility or activity subject to this rule.  The fact sheet shall briefly set forth the principal facts and the significant factual, legal, methodological and policy questions considered in preparing the draft permit.  The Secretary shall send this fact sheet to the applicant and, on request, to any other person and to the persons required under paragraph 6.8.a.3.

6.9.b.  When a term or condition of the final permit differs from the draft permit the Secretary shall prepare a statement of basis that briefly describes each change from the changes in the draft permit and the reasons for the changes.  The statement of basis shall be sent to the applicant, and to any other person upon request.

6.9.c.  The fact sheet shall include, when applicable:

6.9.c.1.  A brief description of the type of facility or activity which is the subject of the draft

29

permit;

6.9.c.2.   The type and quantity of emissions which are proposed to be or are being discharged;

6.9.c.3.  A brief summary of the basis for the draft permit conditions including references to applicable statutory or regulatory provisions;

6.9.c.4.  Reasons why any requested variances or alternatives to required standards do or do not appear justified;

6.9.c.5.   A description of the procedures for reaching a final decision on the draft permit including;

6.9.c.5.A.   The beginning and ending dates of the comment period under paragraph 6.8.a and the address where comments will be received;

6.9.c.5.B.  Procedures for requesting a hearing and the nature of that hearing; and

6.9.c.5.C.   Any other procedures by which the public may participate in the final decision.

6.9.c.6.  Name and telephone number of a person to contact for additional information;

6.9.c.7.   Any calculations or other necessary explanation of the derivation of specific emissions limitations and conditions including a citation to the applicable emission regulations, control technology guideline, or performance standard provisions and reasons why they are applicable or an explanation of how any alternative emission limitations were developed;

6.9.c.8.  When appropriate, a sketch or detailed description of the location of the emission source(s) described in the application.

ii Restatement of the Law, Second, Torts
Copyright (c) 1979, The American Law Institute
Rules and Principles
Division 13 - Remedies
Chapter 48 - Injunction
Topic 1 - Appropriateness of Injunction
§ **933** Test of Appropriateness

 (1)  **The availability of an injunction against a committed or threatened tort depends upon the appropriateness of this remedy as determined by a comparative appraisal of the factors listed in § 936.
(2)  An injunction is not rendered inappropriate as a remedy for tort by the necessity or advisability of trial by jury on the issues of fact presented.**

**COMMENTS & ILLUSTRATIONS:  Comment on Subsection (1):**

*a. Rationale.*  The availability of an injunction against a tort does not depend solely on the election of the plaintiff of the remedy that he desires, though the fact that he seeks it is significant in determining its appropriateness. After procedural requirements have been complied with (see the Scope Note to this Chapter), the availability of the remedy of injunction depends upon a comparative appraisal by the court of all of the factors in the case. These factors include the relative adequacy to the plaintiff of an injunction and of the other remedies, plaintiff's laches or unclean hands, the relative hardship likely to result to defendant if an injunction should be granted and to plaintiff if it should be denied, the interests of third persons and of the public, and the practicability of framing and enforcing the order or judgment. The expression, the "appropriateness of injunction," is used to designate these criteria of the ultimate suitability of injunction, because they most accurately represent the factors that a court takes into account in determining whether to grant or refuse an injunction against a tort.

The relative adequacy to the plaintiff of injunction and of other remedies, while an important factor in determining the availability of injunction, is not the sole factor. (See § 936(1) (b)). The relative adequacy of the other remedies is dealt with in Topic 2 (§§ § 944-955). These remedies include, for example, damages, the recovery of the possession of land and chattels, and declaratory judgments.

The availability of an injunction against a tort has traditionally been stated in terms of the "inadequacy of the remedy at law," "inadequacy of damages," and "irreparable injury." This matter is treated in more detail in § 938, Comment *b*; see also Comment *c*, where the historical basis is explained. But the adequacy of remedies is concerned solely with the plaintiff's needs and constitutes but one of the factors embraced in the larger problem of the appropriateness of injunction. Moreover, the elliptical, shorthand expressions quoted are misleading. They imply that an injunction will be refused unless other remedies are inadequate in the sense of being wholly unserviceable or worthless, that an injunction is extraordinary in the sense that it will be used only in an extremity, and that an injunction is too sacred for everyday situations. This is not the law. As applied by the courts, the adequacy test has a relative meaning; it is founded upon the adequacy of the injunction as the standard of comparison. When the courts have analyzed these adequacy formulas, they have concluded that other remedies are to be deemed adequate if they are as efficient to the ends of justice as the injunction; otherwise, they are to be deemed inadequate. This concept of relative adequacy has been expressed by American courts for well over a century, and has been reiterated with increasing frequency in modern cases. In many modern cases, such as those involving business torts when the

paramount purpose is to prevent the continuation of a tortious practice regarded as contrary to the public interest, injunctive relief is, as a matter of course, treated as the only appropriate remedy to provide adequate relief for all persons affected.

It is therefore important to bear in mind two things about the "test" of the "inadequacy of the remedy at law" as it has traditionally been expressed: (1) it is only one of several factors to be considered in determining the appropriateness of an injunction as the remedy to be used in a particular case, so that to pose the whole issue in terms of this factor alone is to overload the factor and to force it to be cover other factors that are not accurately included in it; and (2) even as a single factor in ascertaining the appropriateness of the injunctive remedy it should not be posed in absolute terms but in comparative terms for ascertaining the relative adequacy of injunction as against the other remedies that may be suitable.

*b. Threatened tort*.  The expression "threatened tort," as used in Subsection (1) of this Section, contemplates, as a condition for the grant of an injunction, a threat of sufficient seriousness and imminence to justify coercive relief. The seriousness and imminence of the threat are in a sense independent of each other, since a serious harm may be only remotely likely to materialize and a trivial harm may be quite imminent. Yet the two elements must be considered together in the decision of any given case. The more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing the harm too remote.

A defendant may threaten a tort not only by utterances that express an intention to commit a tort, but also by action or inaction that, under the circumstances, shows that there is a dangerous probability that he will commit a tort. Indeed a common method of proving a threat of a future tort is by proving a past tort under conditions that render its repetition or continuance probable. It is not necessary, however, to prove past wrong. Without that, the defendant's words and acts may establish the dangerous probability that is essential. For example, if the defendant is erecting buildings that are obviously designed for use as a meat packing plant and it would be impossible in this neighborhood to operate the enterprise without committing a nuisance, a threat of a nuisance is established. An injunction is not justified, however, by the mere fact that the defendant is in a position where he will be tempted to commit a tort, nor by the fact that persons in his position sometimes do commit torts, nor by the fact that the plaintiff fears that the defendant will commit a tort. For example, before the erection of a proposed dye works on the bank of a river will be enjoined on behalf of a lower riparian owner there must be a showing that the amount and character of the refuse that the defendant is about to put into the stream will probably unreasonably interfere with the plaintiff's use of the water. (Compare § 939, Comments *a* and *b*). Furthermore, these elements of seriousness and imminence must be considered in connection with each of the factors listed in § 936.

**Comment on Subsection (2):**

*c. Trial by jury*.  The rationale of the statement in this Subsection, that an injunction is not rendered inappropriate as a remedy for a tort by the necessity or advisability of trial by jury, is based upon the separation of the choice of the remedy from the selection of the mode of trial of the substantive merits. The appropriateness of an injunction is concerned solely with its suitability as a remedy for a tort. The appropriateness of remedies is determined in the light of those factors that are relevant to the values of the available remedial devices. (See Comment *a*). On the other hand, the selection of the method by which the issues of fact are to be tried, whether by a jury or by the court, is a process apart from the choice of the remedy. The selection of the method of trial is affected by factors that are largely historical, legal, social, political and economic in character, as well as by the values of the several modes of trial available. As indicated by the Scope Note, this Chapter does not deal with the effect of the provisions of constitutions, statutes or rules of court relating to the mode of trial. Instead, it is predicated upon the assumption that

32

these and other procedural requirements have been met.

If, in a given injunction case, there are issues of fact relating, for example, to title to land, on which a trial by jury is required or desirable, the injunction need not be denied. When law and equity have been merged by codes or rules of court those issues that are triable to a jury, either as of right or in the exercise of the court's discretion, may be so tried; and other issues may be tried to the court alone. Whether a jury verdict, if taken, is binding or advisory is a matter beyond the scope of this Restatement.

In several jurisdictions a jury trial with a binding verdict is a matter of right in injunction cases. In some of the states where law and equity procedures are separately maintained, it may be that a jury trial can only be had in another action. If, on the other hand, as in cases of injunction against nuisance, there are issues of fact upon which a trial by jury is not deemed necessary or advisable, the trial may be by the court.

The question of whether trial by jury is required, if not waived by both parties to the suit, is controlled in many jurisdictions by constitutional or statutory provisions. In the absence of these provisions, and also in order to interpret and apply some provisions, consideration must be given to many diverse factors, historical, legal, social, political and economic, in determining whether, in the varying cases of injunction against tort, trial by jury is a necessary or advisable mode of trial. If the answer is in the affirmative, trial by jury may be secured in one of the ways listed above. In any event, the selection of the mode of trial is a problem distinct from that of the choice of the remedy. The appropriateness of remedies turns mainly upon the factors bearing upon their suitability as remedies for the case in hand. (See §§ 936-943). If, therefore, the test of appropriateness of injunction as a remedy for tort, stated in Subsection (1) of this Section, is satisfied, injunction is not rendered inappropriate by the necessity or advisability of trial by jury.