UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

MAYA NYE, et al.,

    Plaintiffs,

v.                                     Case No. 2:11-cv-00087

BAYER CROPSCIENCE, L.P.,

    Defendant.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
TO DISQUALIFY SAM MANNAN AS SPECIAL MASTER
AND STRIKE SPECIAL MASTER'S REPORT**

In support of their motion to disqualify Dr. M. Sam Manna, P.E., C.P.S., as special master, and strike his report in this proceeding, Plaintiffs, by Counsel, state as follows:

1.    This Court issued an order dated February 23, 2011,[1] appointing Dr. Mannan as the Court's independent expert witness in this proceeding. Pursuant to the terms of the February 23, 2011 order, Manna was authorized to:

    (1)    Physically inspect those portions of the Bayer CropScience (Bayer) facility in Institute, West Virginia that he deems relevant to this matter;

    (2)    Physically inspect the documents and electronically stored information that he deems relevant to this matter; and

    (3)    Perform any other necessary inspection or investigation he deems necessary to:

        A. Assess the process safety of the manufacture, storage, and transport of methyl isocyanate (MIC) unit at the Bayer facility; and

        B. Assess the probabilistic risk of a catastrophic incident involving MIC at the Bayer facility.

2.    The February 23, 2011 further directed Bayer CropScience, L.P., to "provide to Dr. Mannan the contact information of a person who will serve as his single point of contact...[who] will be

---

[1] The February 23, 2011 Order includes all elements of an order appointing a special master required by Fed. R. Civ. Proc. 53 (b)(2).

responsible for the production of documents requested by Dr. Mannan and for arranging for Dr. Mannan's access to the facility as requested, and for arranging contact with the persons at the plant that Dr. Mannan deems necessary to interview regarding this matter."

3. The February 23, 2011 order further provided that: "Dr. Mannan shall have access to a knowledgeable person at the plant who is tasked with the implementation of safety measures, and who can expeditiously respond to Dr. Mannan's inquiries, or, if that person cannot effectively respond, can arrange his contact with the appropriate persons who can do so."

4. Additionally, the February 23, 2011 order provided that: "The parties shall take care to avoid unsolicited communications with Dr. Mannan," and provided further that "any party may inquire as to any contact or conversation Dr. Mannan has had with employees of the defendant corporation or with the plaintiffs and may also examine him about the documents he has reviewed in the course of his investigation."

5. Lastly, the February 23, 2011 directed Dr. Mannan to file a written report on March 14, 2011 which should contain the foundation for the expert's findings, and an assessment of:

> (1) the process safety of the manufacture, storage, and transport of MIC at the Bayer facility, and
>
> (2) the probabilistic risk of a catastrophic incident involving MIC at the Bayer facility.

6. On March 14, 2011, Dr. Mannan filed his report with the Court and the parties. Dr. Mannan's report provided in Appendix D a list of extensive contacts with Bayer personnel over the course of his visit, and in Appendix C a list of documents delivered to him by Bayer.

7. Apart from the documents listed in Appendix C to Dr. Mannan's March 14, 2011 report, in the course of discovery, Counsel for Bayer produced for Plaintiffs a separate list of documents delivered to Dr. Mannan, including a specific list of documents delivered between February 28, 2011 and March 2, 2011, which list is attached hereto as **Exhibit "A"**.

8. The last document identified on **Exhibit "A,"** the Feb 28 – Mar 2 document list, is item 33 which is identified as "Draft – Bayer Institute MIC – water modeling (explained it was a draft and that we could provide a final version)." Item 33 itself (**Exhibit "B"**) is an eighteen-page document with a title page that recites:

Bayer Institute
MIC – Water Modeling
March 2, 2011

9. Although the title is not descriptive to a lay person, the MIC-Water Modeling document is a "gas modeling" study, i.e., a study of the distances at which lethal and non-lethal quantities of MIC gas is dispersed, based upon a number of assumptions relating to matters such as: (a) the size of the release in pounds, (b) height of release, (c) wind direction and speed (d) weight of the gas released, and (e) release rate.

10. Plainly, the subject matter of the "Bayer Institute MIC-Water Modeling" report dated March 2, 2011 relates directly to the charge of this Court to Dr. Mannan, viz.: to assess the "probabilistic risk of a catastrophic incident involving MIC at the Bayer facility." Feb. 23, 2010 Order at p. 1.

11. But Bayer did not have any gas modeling reports. In response to Plaintiffs' Document Request No. 41 for "all documents pertaining to 'dispersion modeling,'" as used a document previously disclosed to Plaintiffs, Defendant Bayer responded: No responsive documents.

12. And it is now clear that the statement, made before March 2, 2011, was accurate. Indeed, the statement would have been true after March 2, 2011 for one simple reason – the gas modeling document delivered to Dr. Mannan, and incorporated into his report on a wholesale basis – the document was prepared by one David Moore. Although not an employee of Bayer, David Moore is a contractor for Bayer (paid approximately $1,500,000 this year). And though not an officer or director of Bayer, Bayer's Counsel in this proceeding has identified Moore as an expert witness.

13. David Moore is a professional engineer, and the President and CEO of a company named AcuTech. More germane to this proceeding, and in particular this motion, David Moore is an expert witness retained by Bayer's counsel in this proceeding, JacksonKelly, PLLC.

14. Plaintiffs' counsel was advised that David Moore was the author of the document -- "Bayer Institute, MIC-Water Modeling, March 2, 2011" -- on March 15, 2011 at some time after 5 PM after Plaintiffs' Counsel had noted the deposition of the author of the document and requested his name in an email dated March 15, 2011.

15. At his deposition on March 16, 2011, Mr. Moore admitted that he was the author of the MIC-Water Modeling document given to Dr. Mannan:

```
11    … You're the author of this document,
12    correct?
13       A.   I contributed to it.
14       Q.   Tell me what that means?
15       A.   My company is supporting Bayer's Institute
16    site on a number of things and we prepared the
17    technical content of this.
18       Q.   What role did you have in the preparation
19    of it?
20       A.   I'm the project manager for all of our
21    activities here at the site, so I helped in the
22    coordination of the assignment and making certain
23    that it got done.
24       Q.   It was prepared in a PowerPoint format
```

```
                5
 1   initially, correct?
 2       A.   Yes.
 3       Q.   Were you aware that it was presented to
 4   Dr. Mannan?
 5       A.   I was told it was after the fact.
 6       Q.   You understood it was being used for that
 7   purpose, correct?
 8       A.   Yes.
 9       Q.   And you understand that you have been
10   designated as an expert witness in this case on
11   behalf of Bayer?
12       A.   Yes.
13       Q.   Have you ever been involved in lawsuit
14   where you were allowed to provide a PowerPoint
15   presentation to an independent expert without the
16   other side being present?
17       A.   No, I have not.
18       Q.   Do you consider that proper?
19       A.   I was doing what I was asked to do by the
20   client.
21       Q.   Who at the client asked you to do that?
22       A.   Mr. Devgon.
```

David Moore March 16, 2011 deposition, **Exhibit "C"** at pp. 5-6.

    16.     Moore was unclear on whatever knowledge Dr. Mannan had of his status as an expert for Bayer and his authorship. Regarding Moore's status as an expert, Moore gave ambiguous testimony,

assisted by Counsel for Bayer:

```
11     Q.   To your knowledge is Dr. Mannan aware that
12  you're an expert in the case?
13     A.   Yes, I believe he knows that.
14     Q.   And how would he have come in possession
15  of that knowledge?
16     A.   I'm not certain but I was told that he was
17  aware.
18     Q.   Who told you that?
19     A.   Bayer, Mr. Devgon.
20          MR. EMCH:  Well --
21          MR. DEPAULO:  Objection, objection, I
22  don't want you to assist the witness at this point.
23          MR. EMCH:  He is confusing experts working
24  for Bayer and expert in the case.
```

8

```
 1          MR. DEPAULO:  I'm going to object to you
 2  interposing a talking objection.
 3          MR. EMCH:  I'm trying to make the record
 4  clear.
 5          MR. DEPAULO:  Well, then you have an
 6  opportunity to cross-examine also.
```

7-8

17. Regarding Dr. Mannan's knowledge of Moore's authorship, Moore's testimony was unambiguous:

```
10     Q.   (By Mr. DePaulo) When did Mr. Devgon tell
11  you that?
```

```
12      A.   I don't recall but more likely on the 3rd
13 of March when I visited the plant.
14      Q.   And why do you say that?
15      A.   Just because we had a follow-up meeting
16 and I asked if there was anything further I could
17 do and mentioned that this was the case.
18      Q.   This?
19      A.   That there had been a meeting with
20 Dr. Mannan at Bayer.
21      Q.   And what?  When you said this was the
22 case, what was the case?  I don't understand what
23 you're saying.
24      A.   I believe during that, that he said tha
9
 1 Dr. Mannan was aware that we had helped to put this
 2 together for Bayer.
```

8 – 9

18. Most damning, Moore confirmed that the numbers which appear in the work papers underlying Dr. Mannan's report, were identical to the numbers in Moore's report. Plaintiffs' Counsel, referring to Dr. Mannan's work papers (produced by Dr. Mannan after the filing of his Mar. 14 report, but prior to his Mar. 16 deposition), asked Moore the following:

```
5       Q.   Have you seen this before?
 6      A.   Yes, I have.
 7      Q.   Did you prepare it?
 8      A.   I did not, no.
 9      Q.   Do you know who prepared it?
```

7

```
10     A.   I believe this is Dr. Mannan's work from
11 his report.
12     Q.   If you would, skip to the back please.  Do
13 you see the last two pages, 1522 and 1523?
14     A.   Yes.
15     Q.   Did you prepare those documents?
16     A.   I did not prepare this document, if you
17 mean these pages.
18     Q.   Yes.
19     A.   This output is from PHAST I believe,
20 although it doesn't reference it, you know, taken
21 out of context I'd have to guess it is the PHAST
22 runs.  And we did similar PHAST runs but I didn't
23 make any nomenclature.
```

19. Asked to compare Dr. Mannan's work papers with Moore's gas modeling report, Moore acknowledged their identical content:

```
10     Q.   Do you see the table of information on the
11 left?
12     A.   Yes.
13     Q.   Study Folder, ERPG-2, Audit Number, Model
14 Vessel, a few other words, Averaging Time, Offset,
15 Concentration, et cetera?
16     A.   Yes.
17     Q.   Are the numbers on Exhibit B the same as
18 or different from the numbers on Exhibit A?
19     A.   Yes, they appear to be the same.
```

```
          20    Q.    Let's check the next page back if you
          21    would.   That is Case 2 MIC ERPG-2.   Would you check
          22    the numbers to see if they're the same or if
          23    they're different.
          24    A.    The numbers appear to be the same.
```
15

20. Venay Devgon, the Bayer employee who delivered the Moore gas modeling analysis to Dr. Mannan, confirmed his role:

```
22 Q. Okay. Mr. Devgon, I'm going to hand you
23 what was marked as Exhibit A earlier today, I
24 believe in David Moore's deposition, and we also
8
1 used it as Exhibit A is Dr. Mannan's deposition.
2 A. Yes.
3 Q. Take a look at it, if you would, please.
4 If you recognize it, tell us what it is.
5 A. This is a draft or the first pass of the
6 quantitative risk analysis that we did, along with
7 Accu-Tech and then we gave to Dr. Mannan based on
8 the scenarios that he described.
9 Q. Okay. When did Dr. Mannan express a
10 desire to have these scenarios run? Here, let me
11 give you his itinerary, which may or may not help
12 you.
13 A. Yes. It was Wednesday, March 2nd that I
14 went to see him, around 12:15.
```

**Exhibit "D"** at pp.8-9

21. Dr. Mannan acknowledged that he knew David Moore and that he knew Moore was working for Bayer, but denied knowing that Moore was an expert until he saw Moore leaving his own deposition which immediately preceded Mannan's

```
22 Q. Doctor, I want review to a number of items
23 with you. We've taken depositions today from an
24 individual from Bayer and also an individual from a
7
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
1 company called AcuTech whose name was David Moore.
2 Do you know David Moore?
```

9

```
 3 A. I know David Moore.
 4 Q. How long have you known David Moore?
 5 A. It's hard to say, maybe 15 years, maybe
 6 more.
 7 Q. Is he a member -- you're on the -- some
 8 kind of an independent safety commission? That's
 9 at Dow, correct? You serve on a board together
10 with Mr. Moore; is that correct, some commission or
11 panel at A&M?
12 A. I'm not sure what question you're asking,
13 but --
14 Q. Well, let me try it then. Let me try to
15 restate it. Do you serve on any boards or
16 commissions with Mr. Moore?
17 A. I don't think it's a board or commission
18 that I serve with Mr. Moore on. Let me explain
19 what you may be inferring to. The Mary Kay
20 O'Connor Process Safety Center of which I'm
21 director, Mr. Moore and his company participate in
22 one of the committees there. So as director,
23 naturally I am -- I also serve there, yes.
24 Q. Are you aware that he has agreed to appear
 8
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
 1 as an expert witness on behalf of Bayer CropScience
 2 in this matter?
 3 A. I didn't know that before today. I mean I
 4 assumed that's what he was doing today, but I
 5 didn't know that.
 6 Q. How did you learn that today?
 7 A. I -- by seeing him here today, that's what
 8 I assumed that that's what he was doing.
 9 Q. Do I understand then that no one has ever
10 told you explicitly that David Moore is a -- has
11 been engaged as an expert witness on behalf of
12 Bayer CropScience?
13 A. No, sir, but I knew that David Moore was
14 working for Bayer.
15 Q. But you know he was working for him, but
16 you didn't know that he was working in any kind of
17 an expert witness capacity? Do I understand you
18 correctly?
19 A. That's correct.
```

**Exhibit E** at pp. 8-9

    22.    Mannan readily that the gas modeling study was received from Bayer:

```
6 BY MR. DEPAULO:
7 Q. Doctor, if you would take a look at this
8 document which has blue "A" in the right-hand
```

```
 9 corner and tell me if you've seen that before?
10 A. Yes, sir, I've seen that before.
11 Q. Can you tell me the context in which you
12 saw that initially?
13 A. It was given to me by Bayer personnel. I
14 think Mr. Vinay Devgon.
```

10

23.    And Mannan acknowledged that he was aware of Moore's authorship, if not his status as an expert for Bayer:

```
17 Q. Well, do you understand that David Wood
18 prepared them for Bayer?
19 A. David Moore you mean?
20 Q. Excuse me. Excuse me. Do you understand
21 that David Moore prepared them for Bayer?
22 A. I have no direct knowledge that he did,
23 but I would assume so.
24 Q. Why would you assume so?
15
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
 1 A. Because during my visit I was told that
 2 David Moore was working on these issues.
 3 Q. And who told you that?
 4 A. I think Vinay Devgon.
 5 COURT REPORTER: Say it again. I'm sorry.
 6 THE WITNESS: I think Vinay Devgon.
 7 BY MR. DEPAULO:
 8 Q. At the time that he told you that -- I
 9 understand from your earlier statement today
10 that -- that you did not understand that he was
11 acting as an expert witness on behalf of Bayer in
12 this case; is that correct?
13 A. That's my understanding, yes.
14 Q. And so that's something you learned
15 literally today, correct?
16 A. I assume today.
17 Q. Well, and I'm the only person that's told
18 you that, correct?
19 A. Yes, sir.
20 Q. I mean, Mr. Emch has not told you that?
21 A. No.
22 Q. Or anybody else?
```

23

24.    Moreover, Mannan conceded he did not understand the basis for the assumptions employed in his own gas modeling results which, of course, is not surprising since he didn't conduct the

11

analysis:

```
11 Q. Doctor, if you would go back to Exhibit A
12 for a moment.
13 A. Yes, sir.
14 Q. Let's -- if we could, let's turn to the
15 last two pages. Look at the last -- you've got
16 Case 2 - MIC IDLH at the top which is the next to
17 the last page?
18 A. Uh-huh.
19 Q. If you had -- Doctor, take a -- I'm
20 indicating with my finger a box over in the
21 left-hand corner there that I understand it reports
22 certain of the assumptions used in the underlying
23 analysis here and maybe we ought to take a step
24 back.
14
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
1 You understand this document to be a
2 modeling of gas dispersion associated -- the gas --
3 the gas being an MIC water created gas, correct?
4 A. Yes, that's a correct characterization.
5 Q. Looking at those assumptions there,
6 Doctor, can you tell me why you used 1800 -- if you
7 drop down to averaging time, Toxic 1800 S. Do you
8 understand that to be 1800 seconds?
9 A. Yes, sir.
10 Q. Which is 30 minutes, correct?
11 A. Yes, sir.
12 Q. Can you tell me why you used that
13 assumption?
14 A. I did not use that assumption. This was
15 calculations as I said were done by Bayer. These
16 were provided to me by Bayer.
```

14-16

       25.      Again, with respect to other assumptions employed in the gas modeling study, Mannan

unhesitatingly attributed selection of the input data for analysis, and the analysis itself, to Moore:

```
4 Q. Let's -- and go one -- go to the next to
5 the last page. Again -- you know, the one down --
6 the one below. Again, the same unit averaging time
7 1800 seconds or 30 minutes, you didn't make that
8 assumption either, correct?
9 A. No, sir.
10 Q. But you understood it came from Bayer?
11 A. That's right.
12 Q. And let's -- let me try to get back in
```

12

```
13 here. Doctor, could you turn to the page,
14 unfortunately they're not numbered, but if you
15 could get to that page in the copy you have?
16 A. Okay.
17 Q. Doctor, if you look at these there's a --
18 you understand IDLH is Immediately Dangerous to
19 Life and Health, correct?
20 A. Yes, sir.
21 Q. What do you understand ERPG-2 to mean?
22 A. Emergency Response Planning Guidelines-2.
23 Q. Is it fair to say that that's a lower
24 level of toxicity than IDLH?
           17
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
 1 A. Yes, sir.
 2 Q. With respect to MIC here, they've got
 3 three parts per million which you understand to be
 4 immediately dangerous to life and health as a
 5 concentration, correct?
 6 A. That's right.
 7 Q. And .25 parts per million is, I don't know
 8 what their exact technical term is, but it's the
 9 level at which it ceases to be immediately
10 dangerous to life and health; is that -- or even
11 any kind of injury; is that correct?
12 A. That's my recollection, yes.
13 Q. It's a tolerable level if that's the right
14 phrase?
15 A. Yes, sir.
16 Q. See here it says discharge rate 15,499
17 pounds per hour?
18 A. Yes, sir.
19 Q. How did you come up with that number?
20 A. I did not come up with that number, but my
21 understanding is that Bayer, from what I understand
22 today, when David Moore did those calculations he
23 did some process calculations.
24 Q. And the temperature, was that your
           18
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
 1 assumption or was that David Moore's assumption?
 2 A. No, that's David Moore's assumption.
 3 Q. And there at density, .12 pounds per cubic
 4 foot, is that David Moore's or was that your's?
 5 A. David Moore's or Bayer's.
 6 Q. But it was not your own in any event?
 7 A. Right.
 8 Q. Let's go back if we could to those last
 9 two pages at that back.
10 A. Yes, sir.
11 Q. Skipping for the moment the material on
12 the left, let's look at the lines on the right.
```

```
13 You have the benefit, Doctor, I believe of having
14 the colored copy of this. If you'll notice there
15 are two separate colors, and if you'll look right
16 here on the left side, you'll see there's a
17 Category 1.5/F and a Category 5/D of different
18 colors. It's my understanding that the two
19 different graphic convictions to the right reflect
20 the alternative scenarios represented by the
21 different assumptions on -- in the bottom -- at the
22 bottom of the box on the left.
23 Is that your understanding also?
24 A. That's my understand also.
19
M. SAM MANNAN, PH.D. -- BY MR. DEPAULO
1 Q. Doctor, let's take a look at what I'm
2 going to call the big circle, the big oval, sort of
3 like a football.
4 A. Okay.
5 Q. What is your understanding, Doctor, of the
6 significance of the outer -- the furthest on the
7 right line, which if you turn and read it, I
8 believe it reads 3599.93, what do you understand
9 that depiction to represent?
10 A. That's the distance at which the IDLH
11 concentration would extend to for this scenario.
12 Q. And which I believe you represented in
13 your report was either two-thirds or three quarters
14 of a mile?
15 A. Probably that.
16 Q. Approximately?
17 A. Approximately.
18 Q. And that's -- you derived that unit of --
19 and mileage from this number here at the bottom,
20 correct, 3599.93?
21 A. That's correct.
```

19 – 20

      26.    Several matters are patent from the "MIC-Water Modeling" document.  First, regardless of authorship, it is not the type of document that Dr. Mannan was ever intended to examine.  Dr. Mannan was engaged, by this Court, to examine business documents common to the chemical industry, i.e., documents pertaining to Bayer's physical facility, its training programs, its compliance efforts, its regulatory history – documents that pre-existed Dr. Mannan's visits and provided either a faithful historic record of past performance, or a reliable indicator of future events.

27. David Moore's "MIC-Water Modeling" document is an advocate's brief. It specifically asserts numerous matters pertaining to his own, subjective judgments as to Bayer's preparedness to start up a new MIC production facility. Among other things, referring to the disaster at Bhopal, India, it asserts that there is "no similar plausible scenario in our MIC unit." **Exhibit B** at p. 4. And it is a MicroSoft PowerPoint presentation document, not a business record.

28. More importantly, the "MIC-Water Modeling" was incorporated directly into Mannan's purportedly independent work product on a wholesale basis. Specifically, the last two pages of the David Moore – authored "MIC-Water Modeling" document consists of graphic depictions of two gas dispersion analyses**.** But the documents (**Exhibits F and G**) produced by Dr. Mannan are literally carbon copies, identical in all respects. And the narrative portions (**Exhibit H**) of David Moore's "MIC-Water Modeling" document which state his underlying assumptions as to release rate, wind speed, density, temperature and discharge rate are tracked verbatim in Dr. Mannan's

29. The Fourth Circuit has made it clear that communications with a special master, appointed under Fed. R. Civ. Proc. 53, are subject to the same rules on disqualification as those applicable to federal judges under 28 U.S.C. 455. Those grounds include not only actual bias but the appearance of bias. In *U.S. v. Stanton*, 916 F.2d 175 (4th Cir. 1990), extended the grounds for disqualification of a special master to a land commissioner, reasoning that:

> We are persuaded that the disqualification standards of *section 455(a)* are applicable to land commissioners. First, the purpose of amending *28 U.S.C.A. ß 455* was to make "the statutory grounds for disqualification of a judge in a particular case conform generally with the recently adopted canon of the Code of Judicial Conduct." H.R. Rep. No. 1453, 93d Cong., 2d Sess. 1, *reprinted in* 1974 *U.S. Code Cong. & Admin. News* 6351. The standard for disqualification defined in *section 455(a)* is substantially identical to the standard set by the Code which specifically states that a "court commissioner" is considered a judge. Second, the amendment was intended "to promote public confidence in the impartiality of the judicial process by saying, in effect, if there is a reasonable factual basis for

> doubting the judge's impartiality, he should disqualify himself and let another judge preside over the case." *Id.* at 6355. *Jenkins*, emphasizing that avoiding the appearance of bias was not only desirable but [**11] necessary, stated that "[a] fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness." *Jenkins, 849 F.2d at 631* (quoting *In re Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 (1955))*.

916 F.2d 178.

30. Clearly a Court-appointed, independent expert in a case with the public significance of the present matter occupies a more important position of public trust than a land commissioner in a transaction involving the transfer of land. But David Moore admitted that an independent expert witness was not obtained in the present case:

Moore admitted the reality of the facts presented her: that the Court hired Mannan but got Moore:

```
 4     Q.    Would it be fair to say that if Judge
 5   Goodwin hired Dr. Mannan to get Dr. Mannan's
 6   analysis of the subject matter of Exhibit A, that
 7   in fact what he got was your analysis?
 8     A.    Would it be?
 9     Q.    Is it fair to say that although Judge
10   Goodwin hired Dr. Mannan to do whatever analysis is
11   represented by that document, in fact you did the
12   analysis, didn't you?
13     A.    Well, my firm did this analysis and the
14   subsequent work.
```

86

31. The issue presented here is not simply the disposition of Mannan and/or his report. Although Plaintiffs note here that there is no evidence, certainly no compelling evidence, of intentional

misconduct on the part of Dr. Mannan.  But the public trust is destroyed by the appearance of impropriety as much as by the reality, and controlling Fourth Circuit authorities mandated Mannan's diqualification, without regard to any finding of actual bias or impropriety on his part.

32. But Bayer has violated this Court's February 23, 2011 Order by having grossly inappropriate communications with Bayer.  This Court should consider imposition of an entire array of sanctions including judgment for the Plaintiffs.  It is apparent now, if it was not before, that no representation made to this Court by Bayer can ever provide the Court sufficient comfort to warrant lifting the current injunction.

Respectfully submitted,

/s/William V. DePaulo
William V. DePaulo, Esq.  #995
179 Summers Street, Suite 232
Charleston, WV 25301
Tel: 304-342-5588
Fax: 304-342-5588
william.depaulo@gmail.com

Counsel for Plaintiffs