## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### At Charleston

MAYA NYE, et al.

      **Plaintiffs,**

v.
                                 **Civil Action No.: 2:11-CV-00087**
                                 **Judge Joseph R. Goodwin**

BAYER CROPSCIENCE, L.P.,

      **Defendant.**

_____

### DEFENDANT BAYER CROPSCIENCE, L.P.'S RESPONSE TO PLAINTIFFS' MOTION TO DISQUALIFY SAM MANNAN AS SPECIAL MASTER AND STRIKE SPECIAL MASTER'S REPORT

_____

### Introduction

The Plaintiffs filed a motion to disqualify Dr. Mannan because they don't like his conclusion that the MIC unit, process, and storage at Institute is safe and does not pose an unreasonable risk to the public, and they have no way to rebut it. The Court asked Dr. M. Sam Mannan to offer an opinion as to the "probabilistic risk of a catastrophic incident involving MIC at the Bayer facility." Order, Feb. 23, 2011, p. 2, Appendix B to Dr. Mannan's Report, attached hereto as Ex. A. Dr. Mannan's opinion, based on his own calculations, was that the probability or risk is that such an event could occur one time in every 184 <u>trillion</u> years. By every known measure or authority, that is an extraordinarily miniscule and acceptable societal risk.

Despite having the burden of proof, and submitting names of supposed experts, Plaintiffs have not provided a shred of testimony to contradict Dr. Mannan's findings or

challenge their accuracy and reliability. Instead, they attempt to avoid Dr. Mannan's conclusion, reached after a diligent review, by attacking him and BCS. The Court should see this tactic for what it is, deny the Plaintiffs' motion, and award BCS its costs and fees incurred in responding.

Plaintiffs have listed many experts, but none have either toured the MIC facilities at the Institute Plant to prepare for this case or even asked to do so. Despite repeated requests that they provide just basic summaries of their experts' expected testimony, Plaintiffs have provided nothing. In fact, as of March 8, Plaintiffs' counsel conceded their experts still "need to read into the case." *See* March 8, 2011 William DePaulo e-mail, attached as Ex. B. Lacking any expert testimony to rebut Dr. Mannan, Plaintiffs choose to attack him with a motion to "disqualify." As set forth in this memorandum, the motion ignores Rule 706, misquotes the Court's order appointing Dr. Mannan, contains inaccurate factual statements, misstates the record, ignores testimony directly on point, and is simply wrong. It is clear that the Plaintiffs make this attack because they lack any credible support for their position. This motion should be denied.

### The Court's Expert

Dr. Mannan is an internationally respected expert in chemical plant process safety. He is the editor of the preeminent reference work in the industry, Lees' Loss Prevention in the Process Industries. Dr. Mannan's CV is Appendix A to his Report, attached hereto as Ex. C.

After agreeing to be appointed by the Court, Dr. Mannan travelled to West Virginia, reviewed a multitude of documents, toured and inspected the MIC facilities and process in question, and interviewed numerous individuals who he selected and BCS

made available.  He also reviewed worst credible case scenarios that he asked to be prepared by BCS.  He produced a detailed 60 page report which was provided to the Court and the parties.  His work, methodology, and conclusions are straightforward, well reasoned, well supported, and contrary to the Plaintiffs' position, which is why this motion was filed.

## Discussion

### Rule 706

Under the Federal Rules of Evidence, "Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing."  Court appointed experts are nothing new.  Indeed, the comments to Rule 706 state "[t]he inherent power of a trial judge to appoint an expert of his own choosing is virtually unquestioned. Notes of Advisory Committee to Rule 706 (citing cases including *Danville Tobacco Assn. v. Bryant-Buckner Associates, Inc.,* 333 F.2d 202 (4th Cir. 1964)).[1]  The Rule states:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. **A witness so appointed shall be informed of the witness' duties by the court in writing**, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness (bold added).

---

[1]   Rule 706 experts are distinct from Special Masters appointed under Rule 53 of the Federal Rules of Civil Procedure.

Plaintiffs' reliance on *U.S. v. Werner*, 916 F.2d 175 (4th Cir. 1990) (which is cited as *U.S. v. Stanton* in Plaintiff's Memorandum) is misplaced.  Contrary to the Plaintiffs' assertions, Dr. Mannan is not and never was appointed as a special master in this matter.  As the Court's order states, he was appointed as an expert pursuant to Rule 706.  While the Plaintiffs' quote from *Werner* is accurate, it fails to reveal the reasoning that the *Werner* Court used to arrive at the conclusion that a land commissioner be held to the same standards for disqualification as judges under 28 U.S.C. § 455 (a).  Namely that "[a]s with factual findings of special masters, factual findings made by a land commission as to the value of land are reviewable under the clearly erroneous standard." *Id.* at 178.

Dr. Mannan is a court appointed expert, not a special master.  This Court gave Dr. Mannan the task of conducting an independent investigation and providing an expert report to the Court and the parties.  Dr. Mannan was not asked, nor has he made, "findings of fact" that are on par with those to be made by this Court.  Dr. Mannan's Report is not determinative in this matter and neither its conclusions nor his opinions are "findings of fact" that "must be accepted by the district court unless clearly erroneous." *Id.*  In short, Dr. Mannan is not a special master and does not "occupy a position functionally indistinguishable from that of a trial judge." *Id.*  Therefore, the standards in section 455(a) are not applicable. Plaintiffs might certainly challenge Dr. Mannan's expert conclusions and opinions if they present evidence that he relied on information that was incorrect or inaccurate or scientifically unsupported, but they have not done so.

### This Court's Order

Importantly, Rule 706 leaves to the appointing order the duties of the witness. Here, Dr. Mannan was appointed by this Court in an order dated February 23, 2011, attached as Appendix B to Dr. Mannan's Report. The order explained how the Court chose Dr. Mannan:

> At the court's request, the parties jointly submitted to the court nominations of expert witnesses to be appointed pursuant to Federal Rule of Evidence 706. After careful review, and with the consent of the expert, the court accepts the parties' jointly submitted nominee, and does hereby APPOINT Dr. M. Sam Mannan, PE, CSP, to serve as a court-appointed expert in the instant matter.[2]

The Court ordered Dr. Mannan, by March 14, to do the following:

> 1. Physically inspect those portions of the Bayer CropScience (Bayer) facility in Institute, West Virginia that he deems relevant to this matter;
>
> 2. Physically inspect the documents and electronically stored information that he deems relevant to this matter; and
>
> 3. Perform any other necessary inspection or investigation he deems necessary to:
>
> > A. Assess the process safety of the manufacture, storage, and transport of methyl isocyanate (MIC) unit at the Bayer facility; and
> >
> > B. Assess the probabilistic risk of a catastrophic incident involving MIC at the Bayer facility.

Order at p. 2.

The Court also directed BCS to cooperate with Dr. Mannan and provide any information requested, including documents, access, and personnel:

---

[2]   Asking the parties for nomination of experts is a recognized method. Reference Manual on Scientific Evidence at 546. The parties supplied two names by agreement and the Court selected Dr. Mannan.

> Bayer shall immediately provide to Dr. Mannan the contact information of a person who will serve as his single point of contact. That person will be responsible for the **production of documents** requested by Dr. Mannan and for arranging for Dr. Mannan's **access to the facility** as requested, and for arranging **contact with the persons at the plant** that Dr. Mannan deems necessary **to interview** regarding this matter.

Order at p. 3 (bold and underlining added).

The Plaintiffs assert two things.  First, that there was something improper about Dr. Mannan interviewing individuals at the plant, even though the Court's order – and the most simplistic possible application of logic – acknowledged that he must do so.  Second, that BCS and Dr. Mannan did something which requires his disqualification because he requested and BCS provided certain information relating to the calculation of the probabilistic risk of a catastrophic incident involving MIC – described by Dr. Mannan as "a worst credible case scenario" – which was precisely what the Court required him to do.

### A.  Dr. Mannan's charge by the Court included interviewing BCS personnel

Rule 706 does not address contact between the parties and the expert.  Reference Manual on Scientific Evidence at 550.  Often, the nature of the appointment and the role of the expert leads "naturally" to permitted contact with the parties.  *Id.*  As seen here, and contrary to Plaintiffs' baseless assertions, the Court expressly recognized that Dr. Mannan would have contact with persons at the plant: "Of course, any party may inquire as to **any contact or conversation Dr. Mannan has had with employees of the defendant corporation** or with the plaintiffs and may also examine him about the documents he has reviewed in the course of his investigation." Order at p. 2 (bold added) Moreover, "Dr. Mannan **shall have access to a knowledgeable person at the plant who**

**is tasked with the implementation of safety measures**, and who can expeditiously respond to Dr. Mannan's inquiries, or, if that person cannot effectively respond, can arrange his **contact with the appropriate persons who can do so.**" Order at p. 3 (bold added). The Court's order prohibited only "unsolicited" contact by the parties with Dr. Mannan. "The parties shall take care to avoid unsolicited communications with Dr. Mannan." Order at p. 4.

Dr. Mannan's Report, supplied to the Plaintiffs, included the list of all documents obtained as well as the schedule naming each person he interviewed. *See* Mannan Report, attached here to as Ex. D, and Appendices C and D to his Report, attached hereto as Exs. E and F, respectively.[3]

That Dr. Mannan interviewed BCS personnel to perform his investigation and form his opinions was no surprise to the Plaintiffs. How else he could he conceivably perform the task assigned him? Indeed, Dr. Mannan's work would have been meaningless had he not done so. Dr. Mannan told his designated point of contact at BCS, Jim Covington, and Institute Site Lead Steve Hedrick the management people he wanted to meet ("I specified by position or responsibilities, not by name….") and also personally selected operators to interview, picking names at random from a list of all operators. Mannan deposition at 36, attached as Ex. E to Plaintiffs' Motion.

To contend that BCS in any way acted inappropriately by responding, via personal interviews or by providing certain documents, to Dr. Mannan's requests for information is absurd and yet another attempt to mask the true and most important fact: Dr. Mannan, in his unbiased, Court-appointed expert opinion, determined that the MIC

---

[3] In order to provide the Court with a full copy of Dr. Mannan's Report, Appendix E is attached hereto as Exs. G and H, respectively.

unit does not pose an unreasonable risk to the community.  All BCS did, on an extremely tight schedule, was to fully comply with the Court's Order.

### B.  Dr. Mannan requested worst case scenarios from BCS

Plaintiffs allege that BCS acted inappropriately by providing Dr. Mannan with the very information that he requested during his two site visits to the Institute Plant.  Dr. Mannan explained in detail his methodology in acquiring the necessary information from BCS:

> Q.    Describe briefly for the record if you would, Dr. Mannan, the methodology that you determined to use in connecting -- in conducting your investigation once you were appointed by the Court to do so.
>
> A.   Well, naturally I looked at the order and tried to figure out what it is that I had to provide the Court.  Second, I asked for a single point of contact with Bayer.  Once I got that -- oh, preceding that, I asked the Court to provide me with as many documents that were available.  So I received a FedEx box with the Court Docket on it.  Once I got the point of contact at Bayer, I contacted them, but as I said sent copies to counsel and to and the Court and told them I was coming to the site visit.  I also asked him if certain documents would be made available either before I got there or during my trip, so I received in another package from Jackson Kelly, which I believe is your firm, and then -- so we had the plant visit.  During the plant visit our -- clearly we couldn't do a thorough PSM audit, okay, but our objective was, I don't know if I can itemize them, I might forget some, but one for example look at -- find out everything we can about the August 2008 incident and ascertain if we knew everything about that and what was being done to address some of the issues.  Find out about how the PSM program worked, find out about OSHA, Bayer, CSB, any other relevant investigations that were made and whether or not those were addressed. I talked to employees both in management level and operators to figure out what was going on.  Toured the site pretty extensively during this time to get a basic understanding of the operations and the systems in place there and then to answer questions like both the process safety issue and  the

probabilistic risk issue, we asked for information from Bayer. In general that would describe the method that we went through. I think we went through a pretty extensive process. I don't know what we could have done any better so that's where I'll leave it.

*** 

Q.   Is the methodology that you described -- is this the kind of process of review and investigation that you have done throughout your career to evaluate things like what the Court asked you to evaluate?

A.   Many times, yes, sir.

Q.   So this is a very familiar process?

A.   I will say yes, this is reasonable familiar process to me.

Mannan at 86-89. He also was very clear as to the level of cooperation he got from BCS:

Q.   Did you receive as best you can determine a full and complete and open cooperation from Bayer in connection with your work?

A.   Absolutely.  Anyone I wanted to speak to, any document I wanted, any work I wanted done, any kind of access to the site or documentation or people, that was provided.  I couldn't -- I couldn't have asked for anything more.

Mannan at 89. And he was crystal clear as to who directed what he got:

Q.   Who was it who controlled what you saw, what was provided to you, the information that was given to you? Who was in control of that, was that you who said I want these things?

A.   If [sic] was always myself.

Mannan at 90.

Plaintiffs focus their motion entirely on two paragraphs from Dr. Mannan's Report referencing his review of dispersion modeling which he asked BCS to provide.

Mannan Report at 55.  Dr. Mannan explained repeatedly throughout his deposition that this modeling – representing the modeled extent of a worst credible case release – was not material to his conclusions. All that mattered for his probabilistic risk conclusion was a consequence that was catastrophic and therefore unacceptable.  How catastrophic was not critical; the critical point was how low was the risk of that consequence ever occurring.

Dr. Mannan requested that a probabilistic risk scenario (generally referred to in his deposition as "scenario 2") be prepared.  BCS asked its PHA and process safety consultant, AcuTech, who had personnel on site at the plant in conjunction with its ongoing work for BCS, to do this.  The results were the "logic diagrams" attached to Mr. Moore's deposition as Exs. A and C, and the "event tree" attached as Ex. D.  Dr. Mannan testified they were created because he asked for them.  Mannan at 102-03.

AcuTech was asked by BCS to prepare "cases that Dr. Mannan was inquiring about because we have the technical capability to run a dispersion model and could do the quantitative analysis."  Moore deposition, at 6, attached as Ex. C to Plaintiffs Motion. Mr. Moore testified that Exhibit A to his deposition was actually prepared by an AcuTech technician who was on site, and that he "contributed" to Exhibit A.  Moore at 4.  Mr. Moore never talked to Dr. Mannan about this case. Moore at 6-7.  Indeed, he was told "after the fact" that the calculations were presented to Dr. Mannan.  Moore at 5.   Dr. Mannan's testimony is consistent with Mr. Moore's testimony that the two did not speak regarding this matter:

> A.  So let me clarify first of all for the record that I had no communications whatsoever with Mr. Moore throughout this project.

Mannan at 28.

The information was used by Dr. Mannan who proceeded to perform his own computations related to the worst credible case scenarios:

> Q.   Now, in this Scenario No. 2, the credible worst case scenario that was analyzed, the computations of -- of the expected frequency that appear on Page 55 of your report, Doctor --
>
> A.  Yes, sir.
>
> Q.   -- for the condenser tube leak and the sabotage scenario. The condenser tube leak was 5.44 times 10 to the negative 15 per year --
>
> A.  Yes, sir.
>
> Q.   -- who multiplied that out and got that number?
>
> A.  I did.
>
> Q.  You did that?
>
> A.  Yes, sir.
>
> Q.  And you did the one for sabotage as well?
>
> A.  Yes, sir, I did.

Mannan at 109-10.   In fact, his number, when compared to that calculated by Mr. Moore, was different. Mannan at 114. Both, Mannan testified, are valid:

> Q.   In fact, David Moore when he did the computations, which are reflected on I think Exhibit C, he came out with a slightly different number than you?
>
> A.  Yes.
>
> Q.  Correct?
>
> A.  That is correct.
>
> Q.  Both numbers are valid, you agree?

> A.   Yes, both numbers are valid.  As I said people with even similar backgrounds, similar experience, similar expertise may come up with some orders of magnitude, different number, yeah.

*Id.*

The response to the Plaintiffs' complaining that information came from David Moore is "so what?"  Dr. Mannan asked for certain information to be prepared.  That was done and provided to him for review.  Plaintiffs repeatedly note that Dr. Mannan did not know Mr. Moore was an expert witness but ignore all he <u>did</u> know, primarily that he had complete confidence in David Moore and knew he would "tell it like it is."  Specifically, he testified:

> Q.   Within your field of work and in the industry, I mean is this a highly regarded company to do the kind of work that they've been asked to do by Bayer in this instance?
>
> \*\*\*
>
> Q.   Let me ask you the same kind of question about David Moore, same thing.
>
> MR. DEPAULO:  Objection, foundation.
>
> A.   My answer would be the same.  Again, I've known David personally for a long time and I have complete confidence that he would do it -- say it like it is.
>
> Q.   Now, if the Court had called you cold, Dr. Mannan, just given you a call on the phone and said, you know, I saw that you run this -- this program down at Texas A&M and I'm looking for somebody to take a look at the PHA's that were done by Bayer down there and I'm looking for somebody to do a probabilistic risk analysis, would you have had any hesitation to recommend to the Court ABS Consulting and David Moore to do those?
>
> A.   Absolutely not.

Q.      If you were picking somebody to recommend to the Court, those two you would have no problem recommending them to the Court?

A.  Absolutely not.  Also, let me make it clear that the call to me from the Court was cold.  In fact, if I had not been working that weekend probably I would not be sitting here today.

Mannan at 99-102.  Dr. Mannan also made it abundantly clear that whether Mr. Moore

was an expert or not did not matter:

Q.      And certainly you had no knowledge that those expert witnesses had written the materials submitted to you by – by Bayer?

A.      No, but I knew that David Moore was working for them and it doesn't surprise me David Moore had part in preparing these documents.

Q.      But again, you didn't know he was an expert witness?

A.      No, absolutely not, not until today.

***

Q.      Well, if you had known that David Moore was working as an expert from Bayer CropScience, would you have accepted his -- his calculation of the gas dispersion?

A.      Okay, let me make this clear.  I don't know if this was clear before or not.  I knew that David Moore was working on these modeling, what I didn't know whether he was an expert witness or not, okay?  So I didn't have a problem with him making the calculations.  He -- naturally he has done these calculations a lot of times so I don't have a problem with that.

Q.      I understand that you didn't know he was an expert until today.  My question is, if you had known that he had been engaged by Mr. Emch and his law firm as an expert on behalf of Bayer Science, do you believe that you would

> have been fulfilling your charge to the Judge to rely upon
> his analysis rather than your own?
>
> A.    I don't think I would have a problem.  No, I have
> confidence in David's abilities.

Mannan at 30, 85.  Dr. Mannan then performed his own probabilistic risk calculation for

the worst case scenario event that would result in catastrophic and unacceptable

consequences, showing the probability that it could occur only once in 184 <u>trillion</u> years

(184,000,000,000,000).

None of this was secret or concealed or withheld.  All of the exhibits that

Plaintiffs discussed were listed in Dr. Mannan's Report and supplied by BCS and/or Dr.

Mannan to Plaintiffs' counsel.  When Plaintiffs' counsel asked to depose "the person who

prepared" the water into MIC document (Exhibit A to Mr. Moore's deposition, scenario

2), BCS's counsel immediately produced David Moore for deposition.  There was

absolutely no effort to mask or equivocate regarding any of that information; to the

contrary, BCS was totally open and cooperative in providing it.  What is most telling is

that for all the time and trouble Plaintiffs spend in pursuing their attack, they say nothing

-- absolutely nothing -- about the accuracy of any of the calculations or the credibility or

reputation or reliability or ability of Mr. Moore or Dr. Mannan, which are impeccable and

unchallengeable for both of them.  Unquestionably, top people in the fields should be met

with substance, not unfounded rhetoric.

### C. Dr. Mannan answered the Court's "Probabilistic Risk" question

Dr. Mannan was directed by the Court, in part, to "[a]ssess the probabilistic risk

of a catastrophic incident involving MIC at the Bayer facility."  Order, Feb. 23, at 2.  He

did just that, using as part of his analysis logic diagrams, an event tree, and a standard,

routine computer dispersion model prepared by David Moore and AcuTech. After performing his own calculations, he concluded "[g]iven that the judge has asked me to look at the probabilistic risk of a catastrophic release, no, I don't think it poses an unreasonable risk."[4] In other words, Dr. Mannan accepted that the release event would be catastrophic if it ever happened, but calculated that a frequency of once every 184 trillion years was a reasonable risk.

The Plaintiffs don't like this, so their counsel engaged Dr. Mannan in discussing dispersion modeling, not probabilistic risk analysis. These are two different things. Dispersion modeling seeks to estimate the potential area that would be affected by a catastrophic event. Probabilistic risk analysis deals with the probability or predicted frequency of the event ever occurring at all.

Dr. Mannan explained at length that he did not look in detail at the precise "catastrophic" consequences. "[I] did not specifically interpret the court order to mean that I have to look at those number and do – give some conclusions on that, but I'm pretty sure there is a significant number of population there." Mannan at 59. Plaintiffs' counsel persisted, and Dr. Mannan explained:

> A.    As I understand your question, the gas dispersion side or how far it goes, I don't disagree it's a relevant issue, and I have said before that any significant amount of MIC

---

[4] Mannan at 121. He testified about the underground MIC storage facility, which the Plaintiffs now identify as their biggest concern, and stated "I would say that the current storage facilities there a lot of care and effort has gone into it and the layers of protection that are there, and I don't think I have ever seen anything like that except from maybe a chemical demilitarization and we're talking about chemical there that are far worse than methyl isocyanate." Mannan at 116. He further testified:

> Q. So can you say to the citizens of the Kanawha Valley that this Bayer storage facility in place in Institute for MIC is among, if not the best, such facility you have ever encountered at a chemical plant in this country?

> Mr. DePaulo: Objection, foundation.

> A. This current storage is – would fit the definition you just gave.

gets off site, it's an impact population, okay, *but the bottom line is that the issue that you need to look at is what is the unreasonable risk or what is the probability of that happening.*

Q.      I understand, but again if -- I want to try to assist the Court here to some extent.  He's got to make some judgment as to what are tolerable risks in the community and whether a risk is tolerable or not is in part a function of the potential -- the scale of the potential disaster; is that a fair analysis?

A.      As I said, yes, that is a fair analysis that if you have larger footprint, then you worry about it more and that's why *you have to come back and look at your layers of protection and say do we have enough.*

Mannan at 80-81 (italics added).

So, while Plaintiffs want to talk about <u>how many people</u> might be affected by a catastrophic event, Dr. Mannan was not asked to form that opinion by the Court nor did he.  What his testimony repeatedly and unequivocally demonstrates is that there is an infinitesimally low probability of the catastrophic event ever happening, testimony the Plaintiffs don't want to hear, so they attack him and BCS for providing the information needed to do his work.

## **The Bottom Line**

Although Dr. Mannan identified for Plaintiffs' counsel the bottom line questions that needed to be asked in this situation, Plaintiffs' counsel did not ask Dr. Mannan those questions; but BCS's counsel did:

Q.   Mr. DePaulo again at one point in your examination got to a couple of questions that you said were most important, but he did not ask them.  I would like to ask those two questions of you.  One of them was I believe you said, the bottom line question, regardless of perception, is

does the facility that you're looking at pose an unreasonable risk to people living around it?  Do you remember that?

MR. DEPAULO:  Objection.  Objection for the question on the grounds of foundation and beyond the scope of his engagement and beyond the scope of his expertise.

A.     Given that the judge has asked me to look at the probabilistic risk of a catastrophic release, no, I don't think it poses an unreasonable risk.

Q.     There was a second question which was given everything that you have looked at and reviewed about Bayer CropScience and what it is doing and implementing now with respect to the MIC process and unit and storage in Institute, are the right things being done by Bayer?

A.     With the qualification that I have made certain recommendations, yes, I think the right things is being -- are done.  I mean even with my recommendations, I would expect that they would follow through with it.  The reason I say that is because the OSHA investigation, the CSB investigation, Bayer's own internal investigation, they have not discarded any of the recommendations that came up from it, okay?  They looked at it and tried to resolve it as best as they can.  So I have no reason to believe that they wouldn't implement my recommendations either.

Mannan at 119-120.  Finally, Dr. Mannan brought his opinions down to a personal level:

Q.   Dr. Mannan, from the standpoint of safety with respect to the process of manufacturing and transporting and storing MIC at the Institute facility, from the standpoint of safety, would you, sir, yourself have any trepidation in living next to the plant?

A.   None at all

Mannan at 120-121.

## Conclusion

For these reasons, BCS respectfully requests that the Court deny the Plaintiffs'

motion and award BCS its costs and fees incurred in responding.

BAYER CROPSCIENCE, L.P.

By Counsel

/s/ Ryan E. Voelker
Alvin L. Emch, Esquire (WVSB # 1125)
Thomas J. Hurney, Jr., Esquire (WVSB # 1833)
Michael M. Fisher, Esquire (WVSB # 4353)
Ryan E. Voelker, Esquire (WVSB # 11159)
JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P. O. Box 553
Charleston, WV 25322
(304) 340-1000
*Counsel for Defendant*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### At Charleston

MAYA NYE, et al.

      Plaintiffs,

v.                                          Civil Action No.: 2:11-CV-00087
                                          Judge Goodwin

BAYER CROPSCIENCE, L.P.,

      Defendant.

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18th day of March 2011 a true and correct copy of *Defendant Bayer CropScience, L.P.'s Response to Plaintiffs' Motion to Disqualify Sam Mannan as Special Master and Strike Special Master's Report* was sent via electronic mail to plaintiffs' counsel.

                              william.depaulo@gmail.com
                              William V. DePaulo, Esquire (WVSB #995)
                              179 Summer Street
                              Suite 232
                              Charleston, WV 25301
                              *Counsel for Plaintiffs*

                              /s/ Ryan E. Voelker
                              Alvin L. Emch, Esquire
                              JACKSON KELLY PLLC
                              500 Lee Street, East, Suite 1000
                              P. O. Box 553
                              Charleston, WV  25322
                              (304) 340-1000