**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

WARNE FERGUSON,

        Plaintiff,

        v.                                    Case No. 2:11-cv-00087

BAYER CROPSCIENCE, L.P.,

        Defendant.

## S E C O N D   A M E N D E D   C O M P L A I N T

Pursuant to this Court's Order dated April 4, 2011, Plaintiff Warne Ferguson, files this Second Amended Complaint as of right, and in support thereof, states as follows:

### I.        Jurisdiction and Venue

1.        This Court has jurisdiction of this matter under 28 U.S.C. § 1332 because the parties are citizens of diverse states and the amount in controversy involves more than $75,000, exclusive of interest and penalties.

2.        Venue properly lies in the Southern District of West Virginia under 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

### II.        Parties

3.        Warne Ferguson, is a retired resident of the Pinewood neighborhood of Institute, West Virginia and the executor of the estate of Gail Marie Ferguson, his wife, who died on October 11, 2008.

4.        Defendant Bayer CropScience, L.P. is a for-profit, limited partnership organized in the state of Delaware, the general partner of which is Bayer CropScience Holding, Inc.  The limited partnership's principal office, and the general partner's address, are listed with the West Virginia

Secretary of State as 2 T. W. Alexander Drive, Research Triangle Park, NC, 27709.   The agent for service

of process is listed with the West Virginia Secretary of State as Corporation Service Company, 209 West

Washington Street, Charleston, WV, 25302.

### III.      Statement of Facts

5.       On August 28, 2008, at about 10:35 p.m., a runaway chemical reaction inside a 4,500

gallon pressure vessel known as a "residue treater" in the methomyl unit at Bayer's pesticide

manufacturing plant at Institute, West Virginia caused the 5,700 pound, stainless steel vessel to explode

violently, launching the 2 ½ ton "residue treater" 50 feet into the air, releasing shrapnel randomly

throughout the methomyl unit and destroying everything in the vessel's path.  Highly flammable solvent

sprayed from the vessel and immediately ignited, causing an intense fire that burned for more than 4

hours, sending flames 200 feet in the air, and causing windows to break in a 7-mile radius. One Bayer

employee died immediately as a result of blunt force trauma, either from being struck by the vessel

itself or the shrapnel released at the time of the explosion (this worker later was found to have a toxic

level of cyanide in his blood which has not been explained).   A second Bayer employee died 41 days

later at the Western Pennsylvania Burn Center in Pittsburgh, Pennsylvania. Six volunteer firefighters who

assisted in the unit fire suppression activities and two contractors working at the facility were treated

for possible toxic chemical exposure. The fire was contained inside the Methomyl-Larvin insecticide unit

by the Bayer CropScience fire brigade with mutual aid assistance from local volunteer and municipal fire

departments. The incident occurred during the restart of the methomyl unit after an extended outage to

upgrade the control system and replace the original residue treater vessel.

6.       In the late evening of August 8, 2008, the Kanawha-Putnam County Emergency

Management Director  –  to whom Bayer repeatedly through the hours following the explosion refused

to supply the most basic information necessary to make decisions affecting public safety, in violation of

mandatory reporting duties --  advised more than 40,000 residents, including the resident students at

the West Virginia State University adjacent to the facility, to shelter-in-place for more than three hours

as a precaution. The fire and drifting smoke forced the state police and local law enforcement

authorities to close roads near the facility and the interstate highway, which disrupted traffic for hours.

7.        The investigation team of the United States Chemical Safety Board (CSB), a non-

regulatory agency modeled on the highly regarded National Transportation Safety Board, determined

that the runaway chemical reaction and loss of containment of the flammable and toxic chemicals

resulted from deviation from the written start-up procedures, including bypassing critical safety devices

intended to prevent such a condition. Other contributing factors included an inadequate pre-startup

safety review; inadequate operator training on the newly installed control system; unevaluated

temporary changes, malfunctioning or missing equipment, misaligned valves, and bypassed critical

safety devices; and insufficient technical expertise available in the control room during the restart.

8.        Poor communications during the emergency between the Bayer CropScience incident

command and the local emergency response agency  -- a direct result of Bayer's flagrant disregard of the

most basic National Incident Management System (NIMS) procedures adopted nationwide after the

September 11, 2001 attack on the World Trade Center in New York -- confused emergency response

organizations and delayed public announcements on actions that should be taken to minimize exposure

risk. Although Bayer reported that "no toxic chemicals were released because they were consumed in

the intense fires," the CSB later confirmed that the only air monitors suitably placed near the unit to

detect toxic chemicals were, in fact, not operational at the time of the incident. In short, no reliable data

or analytical methods were available to determine what chemicals were released, or predict any

exposure concentrations, both of which are critical to public safety and health.

9.        The methomyl unit used the highly toxic chemical, methyl isocyanate (MIC), in a series

of complex chemical reactions to produce methomyl, a dry chemical used to make the pesticide, Larvin.

MIC is manufactured in a separate production unit at the facility and stored in large underground pressure vessels. Liquid MIC was pumped to a "day tank" pressure vessel near the Methomyl-Larvin unit, which provided the daily production quantity of MIC for the methomyl unit and the carbofuran unit, which is about 200 feet west of the methomyl unit. Fortuitously, given the random shrapnel pattern and uncharted flight path for the "residue treater," the MIC storage tank adjacent to the methomyl unit, and the MIC transfer piping between the production unit and the manufacturing units, escaped damage.

10.     The CSB investigation identified the following incident causes:

a.     Bayer did not apply standard Pre-startup Safety Review (PSSR) and turnover practices to the methomyl control system redesign project. The equipment was not tested and calibrated before the unit was restarted.

b.     Operations personnel were inadequately trained to operate the methomyl unit with the new distributed control system (DCS).

c.     Malfunctioning equipment and the inadequate DCS checkout prevented the operators from achieving correct operating conditions in the crystallizers and solvent recovery equipment.

d.     The out-of-specification methomyl-solvent mixture was fed to the residue treater before the residue treater was pre-filled with solvent and heated to the minimum safe operating temperature.

e.     The incoming process stream normally generated an exothermic decomposition reaction, but methomyl that had not crystallized due to equipment problems greatly increased the methomyl concentration in the residue treater, which led to a runaway reaction that overwhelmed the relief system and over-pressurized the residue treater.

11.     The CSB released its final report on the August 28, 2008 explosion and chemical release at Institute, West Virginia on January 20, 2011.   To Plaintiffs knowledge, no federal or state agency with regulatory authority over the operations of Bayer in Kanawha County, West Virginia has implemented the detailed recommendations of the CSB for avoiding and/or dealing with a chemical release like that which occurred on August 28, 2008.

12.     On February 8, 2011, Bayer CropScience, by Counsel, announced in open court that it had continued to manufacture MIC until August 2010 at which time it shut down the production of MIC in order to construct new storage tanks and other facilities related to the production of MIC.  On May 18, 2011, again in open court, Bayer CropScience, by Counsel, announced that it would not commence operation of the newly constructed MIC production facility at Institute, West Virginia and that it was permanenly ending the production of MIC at Institute.

13.     Toxic chemicals were released into the atmosphere at the Institute, West Virginia facility currently operated by Bayer CropScience, by its predecessors in interest, between 1980 and 1985 as follows: 61 MIC leaks, 107 phosgene leaks, and 22 leaks of both MIC and phosgene – all from the current Bayer facility, all prior to the August 28, 2008, and all without reporting the release as required by law. Other violations of applicable laws include the following:

(a)     In December 2007, thiodicarb, a toxic chemical used as an insecticide and sold under the trade name Larvin, leaked into the air and could be smelled by residents throughout the Kanawha Valley.  In violation of applicable NIMS protocols, Bayer took several hours to notify emergency responders of the nature of the spill, despite hundreds of people calling into Metro 911 about the odor and a visible haze over the plant.  Thiodicarb is extremely toxic and has been banned in the European Union.  DEP issued a citation against Bayer for this air pollution violation.

(b)     In 2008 Bayer released but did not report MIC in volumes it contended were not reportable, but which the KCEMS Director stated should have been reported.

(c)     State DEP inspectors recently issued citations to Bayer for mismanagement of the underground MIC storage tank, discovered during a June 2009 inspection for violations dating back to 2003. The citations concern corrosion protection systems installed on the MIC tank.  The contractors that installed the cathodic protection system, meant to control corrosion of the tank's metal surface, did not have proper certification. Furthermore, even though tests that subsequent uncertified workers performed showed that the system was not working properly, Bayer took no action.

(d)     Bayer entered into a Consent Decree with DEP regarding missing Title V (air permit) records from 2007 to 2009.

14.     As noted, on August 28, 2008, Bayer failed to comply with the critical NIMS requirement that the Incident Commander immediately report to local emergency preparedness personnel the explosion and release of toxic chemicals, so local officials could determine what course of action (shelter-in-place, evacuation, etc) was appropriate for the safety of the citizens of Kanawha County, West Virginia. The first Metro 911 notification reporting an explosion at the Bayer plant was called in at 10:33 p.m.  Over the following eight hours, Bayer only communicated with Metro 911 and other emergency responders through the security guard at the gate, identified only as "Steve."  "Steve" would only confirm that there was an emergency at the plant,  that an ambulance was needed at the main gate for a burn victim, and that Metro 911 should "alert the public."  Even though a sheriff's officer learned that the incident occurred in the Larvin unit by 11:00 p.m., Bayer would not release that information. This left local and state officials to coordinate amongst themselves what actions to take to protect the public without any information from Bayer about the nature or scope of the emergency, the expected duration of the emergency, the possibilities of further explosions, and what chemicals were released into the air that night and in what quantities.  This miscommunication continued after the August 2008 explosion incident to an October 2008 leak of MIC.

15.     Bayer has admitted that it intentionally, and in bad faith, obstructed the efforts of public officials charged with the safety of Kanawha County citizens to understand the threats facing them after an incident at the plant, or even the existence of such threats at the moment of greatest vulnerability, through a deliberate pattern and practice of concealing vital information from the public and from the plant's closest neighbors. In testimony for the Hearing on Secrecy in the Response to the Fatal Bayer Chemical Plant Explosion on April 21, 2009, before the House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, Bayer's President and Chief Executive Officer, William Buckner, made perfectly clear the motivations behind his company's use and concealment of information:

There were several reasons why the company sought confidentiality and SSI protection, including legitimate security concerns, the proper scope of the CSB's investigation, and, <u>we frankly admit, the desire to avoid making the controversial chemical MIC part of the public debate</u> regarding the incident. There were, of course, some business reasons that also motivated our desire for confidentiality. These included a desire to limit negative publicity generally about the company or the Institute facility, <u>to avoid public pressure to reduce the volume of MIC that is produced and stored at Institute by changing to alternative technologies, or even calls by some in our community to eliminate MIC production entirely</u>. In any such debate, we believed that because of security concerns, we would have been prevented from a full public defense of our safety and security measures and the multiple layers of protection we employ for our MIC processes. However, we concede that <u>our pursuit of SSI coverage was motivated, in part, by a desire to prevent that public debate from occurring in the first place</u>.

16.     A CSB review of the alternative methods for production of MIC discloses that numerous alternatives to the procedures historically employed at the Institute facility have been considered and either discarded because of the economic costs of the alternative, or never carried through to completion because of the multiple changes in ownership and management of the Institute facility.

17.     Both the Occupational Safety and Health Administration (OSHA) and the Environmental Protection Agency (EPA) had conducted process safety related audits and inspections at the Bayer facility prior to the incident in August 2008. However, the inspections did not correct all the serious, longstanding process safety problems that were revealed by investigations conducted after the incident.

18.     OSHA cited Bayer for deficient process hazard analyses in 2005; however OSHA did not subsequently verify that corrective actions were fully implemented by Bayer, and deficient PHAs were a causal factor in the August 2008 incident.

19.     Gail Marie Ferguson, the wife of Warne Ferguson, was a long term residenct of Institute, West Virginia, and was at her residence in Institute, West Virginia on the night of August 28, 2008 and witnessed the explosion at the Bayer CropScience facility near her residence.

20.     Pursuant to Rule 11 (b)(3), Fed. R. Civ. Proc., Plaintiff and his Counsel certify to this Court that the following factual contentions will likely have evidentiary support after a reasonable opportunity for further investigation or discovery:

(a)     Bayer CropScience' released toxins into the atmosphere in and around Institute, West Virginia as a result of the negligence, gross negligence and recklessness of Bayer CropScience, in breach of a duty of due care in the operation of its chemical facility at Institute, West Virginia.

(b)     Bayer CropScience's release of toxins into the atmosphere in and around Institute, West Virginia was a repeated or continuous injury, the damages from which did not occur all at once but increased as time progressed, such that the injury to Gail Marie Ferguson was not completed, nor were all damages incurred by Gail Marie Ferguson, until the last injury was inflicted and/or the wrongdoing ceased.

(c)     Prior to August 28, 2008, Gail Marie Ferguson ingested chemical toxins as a result of the negligence, gross negligence and recklessness of Bayer CropScience;

(d)     On the night of August 28, 2008, Gail Marie Ferguson ingested chemical toxins released incident to the explosion of the Larvin unit at Bayer CropScience's Institute facility, which explosion was a direct result of Bayer CropScience's negligence, gross negligence and recklessness;

(e)     The toxins released by Bayer CropScience and ingested by Gail Marie Ferguson, before and on August 28, 2008, were the proximate cause of her death on October 11, 2008.

### IV.     Causes of Action

21.     Plaintiffs incorporate paragraphs 1 through 20 of this Complaint as though fully set out herein.

22.     The continuing negligent, grossly negligent and reckless operation of the Bayer chemical facility at Institute, West Virginia constituted a continuing nuisance which deprived Gail Marie Ferguson of enjoyment of her property, and a continuing tort of negligence which proximately caused her death on October 11, 2008.

23.     Warne Ferguson is the lawfully appointed representative of Gail Marie Ferguson, and is authorized by law to prosecute this action under W. Va. Code § 55-7-6.

## V.      Relief Sought

24.     Plaintiff requests compensatory and punitive damages in an amount to be determined at trial, based upon the evidence adduced at trial, including but not limited to damages for: (A) Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advice of the decedent; (B) compensation for reasonably expected loss of (i) income of the decedent, and (ii) services, protection, care and assistance provided by the decedent; (C) expenses for the care, treatment and hospitalization of the decedent incident to the injury resulting in death; and (D) reasonable funeral expenses..

25.     Plaintiff requests, as appropriate under applicable law, reasonable attorneys fees, and the plaintiff's costs of this litigation, including expert witness fees.

26.     Plaintiff requests such other and further relief as the evidence supports, the facts warrant and the interests of justice compel.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Respectfully submitted,

William V. DePaulo, Esq.  #995
179 Summers Street, Suite 232
Charleston, WV 25301
Tel: 304-342-5588
Fax: 304-342-5588
william.depaulo@gmail.com

Counsel for Plaintiffs

9